UNITED PARCEL SERVICE, INC., a
New York Corporation,

and

United Parcel Service, Inc., and
Ohio Corporation

v.

UNITED STATES POSTAL
SERVICE, Appellant.

No. 78–2390.

United States Court of Appeals,
Third Circuit.

Argued March 26, 1979.

Decided Aug. 7, 1979.

Barbara Allen Babcock, Asst. Atty. Gen., Peter F. Vaira, U. S. Atty., Ronald R. Glancz, Thomas G. Wilson (argued), App. Staff, Civ. Div., Dept. of Justice, Washington, D. C., for appellant.

Irving R. Segal (argued), Robert L. Kendall, Jr., John E. McKeever, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees.

Before GARTH, HIGGINBOTHAM, Circuit Judges, and SCHWARTZ,* District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This is an appeal from a final order of the district court which permanently enjoined the defendant United States Postal Service (hereafter Postal Service) from engaging in a parcel post experiment until it obtained approval from the Postal Rate Commission, in compliance with 39 U.S.C. §§ 3622–25. We affirm.

### I

In 1970 Congress enacted the Postal Reorganization Act of 1970, 39 U.S.C. §§ 101 *et seq.* The Act created the Postal Service as an independent unit of the executive branch, 39 U.S.C. § 201. It also created the Postal Rate Commission as a separate independent establishment, 39 U.S.C. § 3601.

The Postal Service is governed by a Board of Governors, 39 U.S.C. § 202, which pursuant to 39 U.S.C. § 402 established an Executive Committee. The Executive Committee is comprised of the Postmaster General, the Deputy Postmaster General, various Assistant Postmasters General, the Chief Postal Inspector, and the General Counsel. 39 C.F.R. § 221.5(d)(1) [1978].

On September 26, 1977 the Executive Committee in accordance with the duty imposed upon the Postal Service to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees," 39 U.S.C. § 403(a), approved implementation of a parcel post experiment called the Local Parcel Service Test Plan. A detailed description of the Plan may be found in the district court's

* Honorable Murray M. Schwartz, United States District Judge for the District of Delaware, sitting by designation.

opinion, *United Parcel Service v. United States Postal Service,* 455 F.Supp. 857, 861–62 (E.D.Pa.1978). Suffice it to say that the Postal Service in mid-October 1977 instituted a twelve-month bulk mailing experiment to test the cost and service feasibility of charging a fixed fee per item for each item mailed by twenty selected shippers, rather than calculating the amount of postage by weighing each individual parcel. Twenty selected shippers in five metropolitan communities[1] entered into contracts with the Postal Service whereby each guaranteed a minimum mailing volume of 50 pieces per day and 250 pieces per week. Delivery of the items was limited to the geographic area covered by the Postal Service Bulk Mail Facility serving the shipper (intra-BMC delivery). Under the test plan eligible articles were (1) items mailable as parcel post and (2) third class single piece mail. "Nonmachineable outsides" (i. e., parcels of unusual dimensions which require hand processing) were not eligible articles. The articles had to be containerized, addressed for delivery in the BMC service area and all special service parcels had to be isolated.

Sample weighings of randomly selected items in the bulk shipment were used to determine the average weight of all items. The cost of mailing each item was based on the average weight thus determined. The cost to the shipper of mailing 50 or more items averaging five pounds or less was 87 cents per item. The cost per item when average item weight was over five, but under twenty, pounds was $1.15 per item. This fixed-fee postage payment system eliminated the need to calculate postage individually on each parcel. In any event, the cost of mailing an item under the test plan differed substantially from the cost of mailing the same item by regular parcel post under the rates and mail classification

schedule then in effect. 455 F.Supp. at 861 n.7, Exhibit 2, Appendix at 47.

United Parcel Service (hereafter UPS), the plaintiff in this action, is a private parcel delivery service. UPS, complaining that the Postal Service had no authority under statute or regulation for conducting such an experiment, commenced an action in the Eastern District of Pennsylvania seeking to enjoin the Postal Service test.

The Postal Service, however, asserting that its test involved neither a change in rates nor a change in classification of mail within the meaning of 39 U.S.C. §§ 3622–23, claimed that such a Plan did not require submission to approval by, or authorization of the Rate Commission.[2]

The Postal Service and UPS submitted the issues to the district court on a stipulation of facts together with certain exhibits and affidavits. Although expressing its belief that "as a matter of pure policy the result advocated by the Postal Service is more desirable . . ." 455 F.Supp. at 863, the district court held that the test plan effected a change in a postal rate and a mail classification. Agreeing with UPS, it thereupon entered an order on July 19, 1978 which " . . . permanently enjoined [the United States Postal Service], from continuing in operation the parcel post experiment known as the Service Test Plan until such time as it has complied with the provisions of 39 U.S.C. §§ 3622–25 (which we have held applicable here)." The statutes which the district court held to be applicable and with which the Postal Service was obliged to comply would require a recommended decision by the Rate Commission approving the test plan. This appeal followed.

## II

Congressional dissatisfaction with postal inefficiency reached a peak in 1970. It was

---

1. Seattle, Dallas-Ft. Worth, Omaha, Boston and Washington, D. C.

2. At no time did the Postal Service contend that the rates charged to the shippers participating in the test plan were the same rates then being charged for regular parcel post mailings. Nor has it urged that the classifications under the test plan for the twenty selected shippers

were the same as the prevailing classifications established for all other shippers. Nor has the Postal Service ever argued that Rate Commission approval would not be required if it sought to institute any feature of its test plan or the test plan itself on a permanent nationwide basis.

then that the Postal Service was established pursuant to the Reorganization Act. Congressional declarations of postal policy resulted in a direction that the Postal Service be "operated as a basic and fundamental service provided to the people . . ." 39 U.S.C. § 101(a). At the same time, Congress commanded that "[p]ostal rates shall be established to apportion the costs of all postal operations to all users of the mail on a fair and equitable basis." 39 U.S.C. § 101(d). In order to eliminate any effect of politics and special interest lobbying on rate-setting and mail classification, Congress completely delegated its rate-setting authority. The power to set rates of postage and to establish classes of mail was vested in the nine Presidentially appointed Governors[3] of the Postal Service. That power, however, was limited to the extent that the Governors' authority over rates and classifications could only be exercised *after* comprehensive review and recommendation by the Postal Rate Commission, the regulatory agency which Congress created to oversee the ratemaking and mail classification process.

The Postal Rate Commission is completely independent of the Postal Service. It is comprised of five Commissioners appointed by the President with the advice and consent of the Senate. 39 U.S.C. § 3601. The concept of the Postal Rate Commission in the statutory schema was described in the Senate Report in these terms:

The bill [Postal Reorganization Act] provides that the Postal Rate Commission shall be a body fully independent of the Board of Governors and fully independent of any influence whatsoever of the Postmaster General or of members of his staff. The Commission's independence is contemplated as being complete from the other arms of the postal service, subject to no subordination within the postal service either expressed or implied. The limited circumstances under which a rec-

ommended rate decision made by the Commission may be modified by the Governors are carefully spelled out in the language of the bill.

It is expected that the Commission will work in harmony with the Board of Governors, acting in a timely and responsive manner to the Board's requests for recommended decisions for changes in rates, fees and classifications.

In discharging the highly important responsibilities vested in the Commission, it must exercise its best judgment to insure that all postal rates, fees, and classifications are reasonable and equitable, and to insure that the rights of all mail users are protected, throughout the ratemaking and classification process, by careful consideration of all the specific public-interest factors that the statute requires be taken into account, and by faithful adherence to all of the ratemaking and classification standards set forth in the statute.

*S.Rep.* 91–912, 91st Cong., 2d Sess. at 13–14. In establishing the "partnership" between the Board of Governors and the Rate Commission, the Senate Committee expressed a fear that:

if the Board of Governors were authorized to control revenues, it would place them in a position of some businesses in the private sector of the economy—pricing with one eye . . . over their shoulder to the effect of the cost of an upcoming labor-management agreement.

*Id.* at 13.

█ As an example of the need for independence of the Rate Commission, the Senate Committee referred to a proposal to raise first-class mail rates:

The recent proposal for a 10-cent first-class stamp in order to raise sufficient revenue to balance the books of the Post Office in one single step is fair proof of that quest for catching up with costs. Most of the money in the postal system

---

**3.** 39 U.S.C. § 102(3). The Governors are appointed with the advice and consent of the Senate and are to represent the public interest in the exercise of the powers of the Postal Service by the Board of Governors. The Board

has eleven members—the nine Governors plus the Postmaster General and Deputy Postmaster General both of whom are *officers* of the *Postal Service* and are appointed by the Governors. 39 U.S.C. § 202.

comes from first-class mail. A 100-percent increase in the rates for all second-class mail would not produce as much revenue as a 5-percent increase in the first-class rate. The temptation to resolve the financial problems of the Post Office by charging the lion's share of all operational costs to first class is strong; that's where the big money is. The necessity for preventing that imposition upon the only class of mail which the general public uses is one of the reasons why the Postal Rate Commission should be independent of operating management.

*Id.* at 13. It was the Senate's view of the Rate Commission which ultimately prevailed in conference and consequently that view now finds its expression in 39 U.S.C. §§ 3621–28. The provisions of these statutes implement the concepts deemed important by the Senate Committee. Thus, after one of the most extensive studies in the Committee's history, *S.Rep.* 91–912 at 1, the postal legislation which was enacted transferred from a burdened Congress to the Postal Rate Commission the "highly intricate problems of ratemaking." It did so because the postal rate structure "need[ed] the fulltime skills of professional econo-

mists, trained rate analysts, and the like." *H.Rep.* 91–1104, U.S.Code Cong. & Admin. News 1970, p. 3649 *supra,* at 3654.

The Postal Service, while recognizing that changes in rates and mail classifications are committed for all practical purposes to the Rate Commission, nevertheless argues before us that it was not obliged to submit its parcel post test plan to the Rate Commission. Essentially it bases this argument on the assertion that no changes in rates or mail classifications were involved. Additionally it argues that a contrary interpretation of the Act would be inconsistent with Congressional intent to increase flexibility and Postal Service control over postal operations.

### III

39 U.S.C. § 3622 requires that any change in a rate of postage be recommended by the Postal Rate Commission.[4] There are nine specified factors in addition to the policies of the Act (*see* 39 U.S.C. § 101) which the Commission is to consider in making its recommendation, 39 U.S.C. § 3622(b)(1)–(9).

Just as changes in *rates* are the subject of § 3622, changes in *mail classification* are

---

**4.** 39 U.S.C. § 3622 *Rates and Fees*

(a) From time to time the Postal Service shall request the Postal Rate Commission to submit a recommended decision on changes in a rate or rates of postage or in a fee or fees for postal services if the Postal Service determines that such changes would be in the public interest and in accordance with the policies of this title. The Postal Service may submit such suggestions for rate adjustments as it deems suitable.

(b) Upon receiving a request, the Commission shall make a recommended decision on the request for changes in rates or fees in each class of mail or type of service in accordance with the policies of this title and the following factors:

(1) the establishment and maintenance of a fair and equitable schedule;

(2) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;

(3) the requirement that each class of mail or type of mail service bear the direct and

indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;

(4) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;

(5) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;

(6) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;

(7) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services;

(8) the educational, cultural, scientific, and informational value to the recipient of mail matter; and

(9) such other factors as the Commission deems appropriate.

subject to the provisions of § 3623.[5] That section requires that any change in mail classification be recommended or initiated by the Postal Rate Commission. The policies of the Act and six specified factors are to be considered by the Commission in recommending any such classification change. 39 U.S.C. § 3623(c)(1)–(6).

The Postal Service, contrary to the argument of UPS, contends that the test plan at issue here does not involve a "change" in any "rate" or "mail classification." As such, the Postal Service asserts that its test plan need not be submitted to the Rate Commission, and it therefore need not obtain a recommended decision of that body. We cannot agree.

## A

■ The Postal Service claims that because §§ 3622–23 do not by their express terms require a recommended decision for the conduct of experiments, it may experiment or test in the marketplace without complying with the statutory requirements involving submissions to the Rate Commission. The difficulty with this argument is that while it is clear that §§ 3622–23 do not expressly require Rate Commission approval of Postal Service experiments, it is equally clear that these statutes contain no express exception for experiments which involve changes in rates and classifications.

We recognize that the Postal Service is under a duty to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C. § 403(a). In discharging its duty to plan and develop, we can understand the desire of the Postal Service to institute test plans or experiments so that postal efficiencies will result. However, it is apparent that in fulfilling its duty to "plan, develop [and] promote," the Postal Service is just as subject to the rate and classification provisions of Chapter 36 of the Act, 39 U.S.C. § 3601 *et seq.* as it is in fulfilling its duty to "provide adequate and efficient postal services at fair and reasonable rates and fees." Under the Act no distinction is made in favor of experiments or tests which involve changes in rates or mail classification. Rather, the Act is completely unequivocal in requiring *all* changes in *any* rates and *any* mail classification to be processed through and by the Commission. In such a posture, the Postal Service argument which relies on an absence of

---

5. 39 U.S.C. § 3623. *Mail Classification*

(a) Within 2 years after the effective date of this subchapter, the Postal Service shall request the Postal Rate Commission to make a recommended decision on establishing a mail classification schedule in accordance with the provisions of this section.

(b) Following the establishment of the mail classification schedule requested under subsection (a) of this section, the Postal Service may from time to time request that the Commission submit, or the Commission may submit to the Governors on its own initiative, a recommended decision on changes in the mail classification schedule.

(c) The Commission shall make a recommended decision on establishing or changing the schedule in accordance with the policies of this title and the following factors:

(1) the establishment and maintenance of a fair and equitable classification system for all mail;

(2) the relative value to the people of the kinds of mail matter entered into the postal system and the desirability and justification for special classifications and services of mail;

(3) the importance of providing classifications with extremely high degrees of reliability and speed of delivery;

(4) the importance of providing classifications which do not require an extremely high degree of reliability and speed of delivery;

(5) the desirability of special classifications from the point of view of both the user and of the Postal Service; and

(6) such other factors as the Commission may deem appropriate.

(d) The Postal Service shall maintain one or more classes of mail for the transmission of letters, sealed against inspection. The rate for each such class shall be uniform throughout the United States, its territories and possessions. One such class shall provide for the most expeditious handling and transportation afforded mail matter by the Postal Service. No letter of such a class of domestic origin shall be opened except under authority of a search warrant authorized by law, or by an officer or employee of the Postal Service for the sole purpose of determining an address at which the letter can be delivered, or pursuant to the authorization of the addressee.

express terminology in the statute, is less than compelling.

## B

The Postal Service argues, however, that its parcel post test does not involve any "rate" or "mail classification" let alone any "change" in any rate or mail classification. According to the Postal Service, a "rate" is only a "rate" when it applies and is available to the entire public at large. Conversely, claims the Service, a "rate" is not a "rate" when it is restricted to twenty selected shippers. Similarly, the Service contends that a "mail classification" is not a "mail classification" when it is limited to twenty volunteer participants.

■ In advancing their respective arguments as to the meaning of "rate", the Postal Service and UPS have engaged in a definitional contest. Each has referred us to varying definitions of "rate" which appear in *Black's Law Dictionary,* 4th Ed., at 1427–28.[6] Just as the district court declined to enter such a fray, so do we. The district court met this challenge to our satisfaction by stating:

The common meaning of a "rate of postage" is simply the fee the Postal Service charges for processing, transporting, and delivering a particular type of mail. Similarly, the ordinary understanding of a mail classification is nothing more complex than a grouping of mail based on established and shared criteria. *See National Retired Teachers Ass'n v. United States Postal Service,* 430 F.Supp. 141, 146 (D.D.C.1977). The usual interpreta-

tion of "change" is alteration or making different.

455 F.Supp. at 863.

■ The wisdom of interpreting these statutory terms in an "ordinary sense" and giving them an ordinary and common meaning is borne out by reference to other sections of the Act. For example, the Act as it employs the particular terms involved here, distinguishes between a *rate* of postage and an *amount* of postage: the "rate" being the charge for a particular type of mail (i. e. one ounce of first class mail for 15 cents) and the "amount of postage" being the total charge assessed for any particular item of mail at the prescribed rate (i. e., three ounces of first class mail at 15 cents results in an "amount of postage" of 45 cents).[7] It is completely evident that the amount of postage per item mailed under the test plan was not in accordance with any existing rate which had been recommended by the Rate Commission. Rather, the amount of postage prescribed under the plan was determined only by applying a new rate established by the Postal Service.

By the same token, it is the mail classification which determines which rate of postage is applicable to the particular item mailed. Thus, mail "classification is a 'grouping' of mailing matter for the purpose of assigning it a specific rate or method of handling. Relevant factors include size, weight, content, ease of handling, and identity of both posting party and recipient." *National Retired Teachers Ass'n v. United States Postal Service,* 430 F.Supp.

---

**6.** The Postal Service in referring to p. 1427 of *Black's Law Dictionary,* 4th Edition, claims that a rate is "a charge to the public for a service open to all and upon the same terms." UPS, relying on p. 1428 of the same volume recites the definition as follows: "As used in the interstate commerce law, [the term rate] means the net cost to the shipper of the transportation of his property; that is to say, the net amount the carrier receives from the shipper and retains."

**7.** Although the term "rate" is not specifically defined in the Act, nor has it been defined in any of the earlier postal acts, the use of that term prior to 1970 gives some Congressional

understanding to its content. For example, in 1967, 39 U.S.C. § 4253(a) prescribed postage on first class mail by stating ". . . [e]xcept as other wise provided . . . the *rate of postage* on first class mail weighing thirteen ounces or less is 6 cents for each ounce or fraction of an ounce." (Italics added). *See also* 39 U.S.C. §§ 4303, 4358–59, 4362, 4422, 4452, 4554 and 4556–57 [1967]. These sections use the term "rate" in the general sense of the *method* by which an *amount* of postage due from the mailer is to be calculated, whether that amount is calculated separately for each piece, as in 39 U.S.C. § 4253(a) (1967), or in bulk, as in 39 U.S.C. § 4422 (1967).

141, 147 (D.D.C.1977), *affirmed*, 593 F.2d 1360 (D.C.Cir.1979) (footnote deleted).[8] Again, it is evident that the Postal Service created *de facto* a new mail classification by virtue of the criteria which it established for participation in the plan, to wit, machineable, containerized, fourth class mail delivered to the BMC in lots of 50 items per day with an average weight of 20 pounds or less and destined for delivery in the BMC service area. Satisfaction of these criteria entitled the mailer to the fixed fee rate for calculating the amount of postage outlined above.

The Act grants the Governors the exclusive and nondelegable authority to establish *"classes of mail"* and *"rates of postage"*, 39 U.S.C. §§ 402, 3621, but only after the Governors have received a recommended decision from the Postal Rate Commission. The Postal Service, on the other hand, is only vested with the power "to prescribe, in accordance with this title, the *amount of postage* and the manner in which it is to be paid," 39 U.S.C. § 404(a)(2). It is thus evident that the amount of postage collected by the Postal Service on any particular piece of mail or parcel must be prescribed in accordance with established rates of postage and established classes of mail. Pursuant to UPS's argument therefore, it would appear that by the institution of its test plan the Postal Service established not only a new classification but also a new rate for that classification. In so doing, UPS claims, the Service has usurped the function assigned by Congress to the Rate Commission and the Governors.

The Postal Service contends, however, that under the Act the terms "rate" and "mail classification" only apply to a *service* made available to *all* members of the public on the *same* terms. If the service is not so available, i. e., if it is restricted to only a portion of the public, then the Service claims that the charges imposed do not constitute a rate and the criteria employed for plan participation do not constitute a mail classification. Hence, the Service argues that anything short of such nationwide availability of a service (such as restricting availability to twenty selected voluntary shippers) does not trigger the rate and mail classification regulatory provisions of Chapter 36 of the Act. It therefore concludes that it may proceed with its test plan without prior recourse to the Rate Commission.

We reject this argument. In essence this position taken by the Postal Service would permit unregulated changes in rates and mail classification at any time and under any circumstances whereby less than all members of the public were entitled to benefits stemming from such changes. We have been shown nothing in the Act which supports the distinction on which the Postal Service relies and we can find no authorization for such a construction of the Act. To the contrary, the Act specifically proscribes the Postal Service from discriminating among its users. 39 U.S.C. § 403(c) reads:

> In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.

As recited earlier, we have found, and the Postal Service has pointed to, no exception which would authorize a test plan such as the one instituted here, in derogation of this section.

While we need not, and do not, decide that a test plan could never be instituted

8. Again, although the term "class" or "classification" has not been specifically defined in this or prior acts, it is evident from its usage prior to 1970 that the term simply means a grouping of mail on the basis of shared physical criteria. For example, prior to 1970, first class mail was "mailable (1) postal cards, (2) post cards, (3) matter wholly or partially in writing or typewriting  .  .  ., (4) bills and statements of account, and (5) matter closed against postal inspection." 39 U.S.C. § 4251 [1967]. The size and weight limitations applied to that class were "one hundred inches in length and girth combined" and seventy pounds. 39 U.S.C. § 4252 [1967]. *See also* 39 U.S.C. §§ 4301, 4351, 4421, 4451 and 4551 [1967] establishing criteria for other mail classifications.

because of the operation of § 403(c), we are nevertheless persuaded that in light of § 403(c) the Postal Service's view of "rate" and "mail classification" is incorrect and cannot prevail.

Not only are the Service's definitions of rate and mail classification unsupported by the Act, and indeed inconsistent with § 403(c) as we have indicated, but apparently the Postal Service itself has recognized that the test plan instituted here involves a change in rate. The definition .urged upon us here by the Postal Service is inconsistent with use of the term "rate" as it was employed by Deputy Postmaster General William F. Bolger when he discussed the test plan during a Postal Forum in September of 1977: ·

> Basically, the main features of the *test program* are . . . a greatly *simplified rate structure* based on average weights . . . [which] allows mailers to forget weight and zone calculations for most intra-BMC deliveries . . . "
> (Emphasis added.)

Fairly read, the term "rate" as it appears in the test plan description is employed in a sense significantly different from that suggested by the Postal Service here, but no different from the meaning given it by the district court and approved by us.

### C

■ Consistent with its denial that the charges imposed upon participants in the test plan were "rates," and that the test plan itself constituted a new "mail classification", the Postal Service also urges that the term "change" as it appears in §§ 3622–23 has a meaning different from that nor-mally accorded that word. The Postal Service contends that a change in rate or class only becomes a "change" within the meaning of §§ 3622–23 when it is permanent and nationwide—not experimental, limited or temporary. It argues that because only nationwide changes in postal *services* need· be submitted to the Rate Commission under 39 U.S.C. § 3661,[9] that Congress intended that Rate Commission jurisdiction over rates and mail classifications would similarly extend only to matters affecting the entire country. However, neither the Act nor its legislative history suggests that any such qualification upon the word "change" was ever intended or effected in §§ 3622–23. ⁕

Although it is true that such a nationwide qualification does exist with respect to changes in the nature of postal *services*, 39 U.S.C. § 3661, no such qualification appears in §§ 3622–23, the statutes with which we are concerned. With respect to postal *services,* Congress clearly contemplated that the nature of such services would vary from one locale to another depending on local conditions such as sparsity of population, ordinances prohibiting curbside delivery, etc., and that changes in such services would often affect only a relatively small number of people in a limited geographic area. Recognizing the lack of national interest in purely local conditions requiring changes in the nature of postal services, Congress did not require Rate Commission action when such localized changes were effected. However, when a nationwide or substantially nationwide postal service change is proposed, then Congress required that the proposed change be submitted to the Rate Commission—not for a recom-

---

9. 39 U.S.C. § 3661. *Postal Services*

(a) The Postal Service shall develop and promote adequate and efficient postal services.

(b) When the Postal Service determines . that there should be a change in the nature of postal services which will generally affect service on a *nationwide* or *substantially nationwide* basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Rate Commission requesting an advisory opinion on the change.

(c) The Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under sections 556 and 557 of title 5 has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title.

mended decision (as required for a rate or classification change) but merely for an advisory (and hence not binding) opinion. It is obvious to us that the substantive differences in § 3661 (services) as contrasted with § 3662 (rates) and § 3623 (classifications) reflect different Congressional concerns and therefore different Congressional requirements. Under such circumstances we perceive little value in attempting to construe §§ 3622–23 by reference to § 3661. We perceive even less value in attempting judicially to impose on the plain and·comprehensive terms of §§ 3622–23, the special provisions which Congress incorporated in § 3661 for manifestly different purposes and reasons. Moreover, it is quite clear that, if Congress had intended to qualify the provisions of §§ 3622–23 by requiring Rate Commission approval of only nationwide changes, it could have accomplished that task in the same manner as it did in § 3661.

Furthermore, if we were to interpret §§ 3622–23 as the Postal Service urges, we would be permitting the Service to make substantial *de facto* and unregulated changes in either rates or mail classifications so long as the changes made were neither "permanent" nor "nationwide". Such a view finds no support in the Act or in the legislative history. Indeed, such a construction of the Act is capable of completely undermining Congressional regulation *via* the Rate Commission of those aspects of postal affairs which are most heavily infused with the public interest—an interest which the Rate Commission is charged with protecting.[10] As the D.C. Circuit explained, albeit in a different but analogous context,

> any reasonable examination of the purposes of the Act discloses Congress' implicit design that the distinct functions of service provision and rate adjustment be divided between the Postal Service and the Rate Commission. The expertise of the Postal Service supposedly is in management, and its authority therefore reasonably extends to basic decisions pertaining to the provision of special, nonpostal and other services. The Postal Rate Commission, however, was created specifically to oversee the ratemaking process. Its expertise is in the setting of rates and fees that are fair and equitable, and its authority therefore reasonably extends to all aspects of such decisions, including review of budget estimates, allocation of postal costs, establishment of rates for postage, and, it would seem plainly, the setting of fees for those special services which management decides should be provided.

*National Association of Greeting Card Publishers v. United States Postal Service,* 186 U.S.App.D.C. 331, 358, 569 F.2d 570, 597 (1976), *vacated in part not relevant here,* 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977).

Thus we do not find persuasive the Postal Service contention that because only twenty test participants were involved in its test plan no "change" in a "rate" or "mail classification" has been effected.[11]

---

10. The Postal Service's construction is also at odds with the thrust of Congressional intent evident in the 1976 amendments to the Act. Prior to that time, the Rate Commission was not required to act upon a request for a rate change within any specified time period and under 39 U.S.C. § 3641 the Postal Service could institute a temporary rate change 90 days after Rate Commission submission. Substantial delays in Commission action produced new requests for rate changes before final action was taken on older requests. To remedy this, Congress required that the Rate Commission act within 10 months but simultaneously amended § 3641 to preclude the Postal Service from instituting a temporary rate change until that 10-month period had elapsed. The premium placed on Rate Commission consideration of, and public hearings on, rate changes is therefore evident. Permitting experiments which involve changes in rates and mail classifications would effectively overrule § 3641. Such "experiments" could be commenced and continued throughout the 10-month course of Rate Commission consideration, so long as the experiment was neither permanent nor nationwide, according to the Postal Service's interpretation.

11. The district court expressed its conclusion as follows:

> There is nothing "plainer" than the fact that postal rates and classifications have been changed as to the participants in the Service Test Plan. When the rates and classifica-

## IV

As we indicated earlier, the Postal Service's other major contention is that Congress intended to recognize the need for increased flexibility and Postal Service control over postal operations so that the Service could more readily respond to postal needs. The Service argues that the district court's interpretation of the Act is therefore inconsistent with Congressional intention.

As our discussion has revealed, we do not believe that, despite Congressional and public desire for increased efficiency in the postal service, the specific and plain provisions of the rate and classification sections can be ignored. Accordingly, we are not impressed with the Postal Service's argument that the mandate given to it to "plan, develop, promote, and provide adequate and efficient postal services," 39 U.S.C. § 403(a), supersedes and overrides the specific responsibilities imposed in the first instance upon the Rate Commission and thereafter upon the Governors to determine the rates and classifications which are components of the "postal services" which the Postal Service is to provide.

■ The general powers provision of 39 U.S.C. § 401(10) [12] may well vest the Postal Service with authority to conduct marketplace experiments.[13] Assuming *arguendo* the existence of such authority, we are nevertheless constrained to reject the Postal Service's interpretation of a general grant of power as authorizing activities which necessarily are precluded by other sections of the Act (§§ 3622–23) specifically mandating the manner by which rates and mail classifications must be established. "[A] general powers provision like section [401(10) here at issue] may not ordinarily override a specific provision such as section [s 403(a) 404(a)(2) and Chapter 36 as here]." *National Association of Greeting Card Publishers v. United States Postal Service, supra,* 186 U.S.App.D.C. at 358, 569 F.2d at 597. Thus, any power the Postal Service may have to engage in marketplace experiments may not be exercised so as to permit the Postal Service to impose rates or establish mail classifications absent compliance with Chapter 36 of the Act, 39 U.S.C. §§ 3601 *et seq.*[14]

Supplementing its "flexibility" and "control" argument, the Postal Service additionally argues that requiring submission of test plans to the Rate Commission is unduly burdensome. We do not here hold that all "test plans" must be submitted to the Rate Commission (*see e. g.* Part III B, *supra,* p. 1377). We do hold, however, that any proposal which would effect a change in mail classification or a rate, including a test or experiment embodying those features, must be submitted to the Rate Commission, no matter how experimental, temporary, or limited in scope the change. As to the burdensomeness of such submissions, we observe that the Rate Commission in 39 C.F.R. § 3001.54(s) [1978] has provided that:

tions applicable to certain users of the Postal Service have in fact been changed, we find it both conceptually and linguistically bizarre to say that although certain postal rates and classifications have been changed, there has not been a change in the rates or classification of postage.
455 F.Supp. at 865.

**12.** The Postal Service shall "have all other powers incidental, necessary, or appropriate to the carrying on of its functions or the exercise of its specific powers."

**13.** Contrary to the suggestion of the dissent (*see* n.9, p. 1378), the issue of whether the Postal Service has statutory power to engage in marketplace experiments with Rate Commission approval is not before us. It was not raised in the district court, nor was it addressed

or briefed on appeal. Under these circumstances we do not deem it appropriate to discuss or resolve that issue.

**14.** The district court, while recognizing the legitimacy of the Postal Service's argument, nevertheless expressed its disagreement with the Postal Service's conclusion by stating:

The very existence and function of the Postal Rate Commission bespeaks a limitation on postal management's freedom. . . . Thus, although requiring that the Postal Service go to the Postal Rate Commission with marketplace experiments might impede one congressional purpose, it would promote another.
455 F.Supp. at 869.

The Commission may, upon the filing of a proper motion by the Postal Service, together with a showing of good cause therefor, waive certain of the filing requirements of paragraphs (b)–(r) of this section if in the Commission's judgment it has been demonstrated that the proposed change in a rate or rates of postage and a fee or fees for postal services does not significantly change the then effective rates and fees or alter the cost-revenue relationships of the various classes and types of postal services.

Thus the Rate Commission itself has provided a measure of relief from the burdens hypothesized by the Postal Service and of which it complains.[15] Moreover, if indeed the Postal Service conceives that it is truly burdened by our construction of the Act, it should address that concern to the Congress, for in the present context we do no more than enforce the Congressional command.[16]

## V

■ Although the Postal Service advances other additional arguments all of which are predicated on its interpretation of the Act, we do not find that those arguments merit discussion. One final contention, though, does warrant our response. The Postal Service contends that we should accord great deference to its interpretation of the Postal Reorganization Act. In doing so, we of course would thereby be obliged to accept the construction placed upon the Act by the Postal Service, including the various definitional arguments which we have previously rejected.

This same contention was made in *National Association of Greeting Card Publishers v. United States Postal Service, supra,* 186 U.S.App.D.C. at 357 n.110, 569 F.2d at 596 n.110. The court there declined to defer to the Postal Service's interpretation on two grounds. In the first instance the D.C. Circuit found the Postal Service's "construction too 'curious' and 'narrow' to prevail over a commonsense reading of the statute," an observation equally appropriate here, and one with which we are in accord. Second, it was recognized there, as we do here, that the agency entitled to deference in the interpretation of 39 U.S.C. §§ 3622–24 is the Rate Commission—not the Postal Service—as it is the Rate Commission which is charged with making recommended decisions on changes in rates and mail classification.

Both of these reasons are sufficient grounds for rejecting the Postal Service's contentions regarding judicial deference to administrative interpretations.

## VI

Thus, by giving the common and ordinary meaning to the relevant terms of §§ 3622–23, it is apparent that the parcel post test

---

**15.** This regulation has never been challenged and hence we express no opinion as to its validity.

**16.** The dissent is unable to point to any authority, statute or legislative history supporting its contention that Congress intended to bypass or override the rate and classification mandates of §§ 3622–23 when they impact upon the managerial functions assigned to the Postal Service. Indeed the dissent acknowledges that the Act and its legislative history are silent in this respect. The dissent premises its entire argument on Congressional efforts to increase the efficiency of the Service, evidenced by Congress giving the Postal Service full management authority (Dissent, pp. 1383–1384)—an argument which not even the Postal Service emphasized to any great extent.

Our more basic difference with the dissent, however, is our belief that the concerns ex-

pressed by the dissent are more appropriate for legislative rather than judicial consideration and action. Our function as jurists is to require compliance with those statutes enacted by Congress. In this case it is not for us to substitute our view of postal policy for the legislation which has been passed by Congress. Certainly Congress is free to modify its enactments so as to accommodate the considerations suggested by the dissent and in fact, we might applaud such legislative adjustments if made. Failing their enactment by Congress, however, and recognizing that Congress has explicitly required all rate and classification changes *without exception* to be submitted to the Commission, we do not think it is our function to rewrite the Act, or at a minimum, to create a legislative exception where none is intimated.

plan at issue here involved changes in the rates of postage and classification of mail. This being so, it was incumbent on the Postal Service to resort to the Rate Commission as mandated by §§ 3622–23. It did not do so. As a result, the district court under date of July 19, 1978 enjoined the Postal Service from continuing in operation the Service Test Plan until such time as it has complied with the provisions of 39 U.S.C. §§ 3622–25.

Having concluded that the district court did not err, we will affirm the July 19, 1978 order.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

## I.

Competition, experimentation and creative business policies designed to better serve the consumer are highly valued in American society. The traditional folklore has been that one beats his competition by "building a better mousetrap," or, in the context of this case, by providing better delivery services. The majority rejects these traditional values—so they say, because of a statutory mandate. Thus, we have the paradox of the United Parcel Service (UPS) one of the United States Postal Service's (Postal Service) major competitors, preventing the Postal Service from undertaking on its own a modest and limited experiment which is a relatively small threat, if any, to the plaintiffs, involving no more than twenty selected shippers in no more than five metropolitan areas. As I view the applicable statutes, the Postal Service need not be shackled and prevented from pursuing such modest experimentation. It has some latitude to experiment, without indulging in further bureaucratic processes, and to determine whether a plan can be devised to provide the American public with better service and its major competitor with more robust competition. The learned trial judge below, in his customarily thorough fashion, noted that "as a matter of pure policy the result advocated by the Postal Service is more desirable." *United Parcel Service v. United States Postal Service*, 455 F.Supp. 857, 863 (E.D. Pa.1976). However, he and the majority have concluded that the statute precludes even the modest experiment proposed by the Postal Service in this case. I agree that the result advocated by the Postal Service is far more desirable. But, I disagree with the majority, and the court below, because their decision, from my view, makes no sense when considered against the relevant legislative history. Thus, I dissent.

## II.

As the majority's opinion observes, the Postal Service and the Postal Rate Commission (Commission) were established under the Postal Reorganization Act of 1970, 39 U.S.C. §§ 101–5605 (the Act), which created a new and comprehensive scheme for the management of the nation's postal system,[1] so that the nation's mail could be handled more efficiently and with less expense.

Acting in accord with this Congressional design, the Postal Service has attempted to undertake a very small and temporary experiment in order to develop a new technique to deliver parcel post more efficiently. The experiment was to involve only twenty shippers in five metropolitan areas, who were to handle about 907,000 items of mail. Defendant's Brief Before Dist. Ct., Exhibits 1(A)–1(R). When compared with the approximately 92.2 billion items of mail and 387 million items of parcel post that the Postal Service processed in 1977, the limited nature of this experiment is self-evident. Department of Commerce, Statistical Abstract of the United States 585, 587 (1978); Joint Appendix, at 29.

In this appeal we are presented with the questions of how Congress intended for the new postal management to modernize the postal system and where Congress placed the responsibility of supervising rate and classification experiments.

---

1. The Act also established a fourteen member Postal Service Advisory Council to advise the Postal Service on "all aspects of postal operations." 39 U.S.C. § 206. The role of the Advisory Council is not raised in this appeal.

In order to decipher the Congressional scheme and resolve this question, the Act and its extensive legislative materials must be reviewed. I am convinced that a review of the legislative materials in their totality is especially important here where the legislation was designed to effect a comprehensive reorganization.

The majority focuses on the language of sections 3622 and 3623 [2] and urges that these provisions place the responsibility for supervising rate and classification experiments in the hands of the Rate Commission. To be sure, the challenged experiment involves a "change" in the way the limited number of program participants send their parcel post. It is also evident that the "rates" and "classifications" used in this experiment are different from those normally applied to the Postal Service's customers. However, it is not self-evident whether the temporary and small-scale "changes" which occur as a result of an experiment are the "changes" Congress was referring to when it drafted these sections of the Act. The decision to make a national or permanent rate or classification change is a management decision of a different quality from a decision to undertake an experiment. At the very least, different criteria of evaluation may be used and different results may flow from the decision. Therefore, before these sections are read to cover experiments it is necessary to unravel the management scheme Congress envisioned.

The majority does so by analyzing whether the ordinary, plain, dictionary, or regulatory definitions of the words "rates," "classifications" and "change" are to be used. In doing so, the majority misses the essential question: Whether these sections were intended to give the Commission the responsibility of supervising rate and classification experiments. As Learned Hand said:

> [I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always

have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) *quoted in, United States v. Cerilli,* 603 F.2d 415, 429 (3d Cir. 1979) (Aldisert, J., dissenting). Arguably Congress might have intended for sections 3622 and 3623 to cover experiments, although they make no reference to experiments. The majority argues that the absence of such a reference supports their view of the Act. It seems equally plausible to me that it indicates a possible limitation on the scope of the Commission's authority. The ease with which contrary arguments can be made about the importance of the absence of a single word in the statute strengthens my conviction that resort to the legislative history is essential.

In this case, our inquiry into Congressional intent is made difficult by the fact that the legislative materials are also silent about rate and classification experiments. However, we are obliged to find an answer and therefore must resort to materials from which the Congressional intent can only be inferred.

### III.

#### A.

After reviewing the Act in its entirety and its legislative history, I am convinced that Congress intended to permit the Postal Service to undertake rate and classification experiments and that it did not intend for the Postal Service to seek Commission approval before it undertook such an experiment. I reach this conclusion because of the overwhelming evidence contained in the legislative history that shows that Congress went to considerable effort to give the Postal Service full management authority. Congress wished to strip away and not create layers of managerial control so that new and more efficient modes of operation

---

2. *See* Majority opinion, *supra,* at nn. 4 & 5 for text of statutes.

could be developed and could become a part of our nation's postal system. Commission review of experiments would be inconsistent with that Congressional purpose. Moreover, I have found nothing in the legislative materials that shows that Commission review was nevertheless intended. Indeed, the references to the Commission contained in both the Act and the legislative history show that the Commission was established and structured so it might address concerns that are not implicated in the experimentation process.

**B.**

In this case, as in many others, the legislative history is ambiguous in many regards. But arising above all ambiguity is the Congressional conviction that the Postal Service should be more efficient, utilizing modern managerial techniques rather than sinking further into its maelstrom and that the Postal Service should have, in most instances, full authority to undertake that effort.

The Congressional debates, reports, and the other legislative materials are replete with references to the inefficiencies of the pre-1970 postal system. For example, the House Report stated:

> For several years there has been a growing awareness . . . that our vast sprawling postal complex is heavily overburdened and in deep trouble. Delays, breakdowns, errors, damage, and other inconvenience to the public have become more and more frequent.

H.Rep.No.91–1104, 91st Cong., 2d Sess. (1970) *reprinted in* [1970] U.S.Code Cong. & Admin.News 3652 [hereinafter H.Rep.] *See also* S.Rep.No.91–912, 91st Cong., 2d Sess. 2 (1970) [hereinafter Sen.Rep.]; Remarks of Rep. Dulski, 116 Cong.Rec.19844 (June 16, 1970); *Towards Postal Excellence the Report of The President's Commission on Postal Organization* 1–14 (1968) [hereinafter President's Commission].

These materials are also replete with references that show that Congress believed these deficiencies were caused by ineffective management, which in turn resulted

primarily from a lack of managerial flexibility and freedom and from a lack of centralized control. For example, the Senate Report which accompanied the Senate version of the Act stated:

> [T]he Postmaster General is blocked or undercut at every turn by a labyrinth of postal statutes echoing every postal concern, interest, or whim expressed by Congress over a 200 year period . . . leaving the Postmaster General bound in his own house. Twist and turn as he may, he cannot function in the public interest as a responsible manager.

Sen.Rep., *supra,* at 2.

The House Report stated:

> It has now become apparent that all the shortcomings of The Post Office Department are bound up in the fact that responsibility for managing the system is shared by a number of executive agencies and by several congressional committees.

H.Rep., *supra,* at 3653. *See also* President's Commission, *supra,* at 33–43.

The Act was designed to correct this problem. New and more efficient systems were to be developed. The new managers would

> create a lasting foundation for a modern, dynamic, and viable postal institution that is equipped and empowered at all times to satisfy the postal requirements of the future.

H.Rep., *supra,* at 3650.

And the Postal Service was to have major responsibility for the development of those new systems. The House Report stated:

> The Postal Service is empowered to engage in research and development programs directed toward the expansion of present postal service and the development of new services responsive to the evolving needs of the United States.

H.Rep., *supra,* at 3657. The Act itself provides that the Postal Service "shall plan, develop, promote, and provide adequate and efficient postal services." 39 U.S.C. § 403.

Further, it is evident that Congress felt that modernization could be accomplished only if the Postal Service was provided broad authority to undertake its duties.

The House Report stated that the Act was designed to

[e]liminate serious handicaps that are now imposed on the postal service by certain legislative, budgetary, financial, and personnel policies that are outmoded, unnecessary, and inconsistent with the modern management and business practices that must be available if the American public is to enjoy efficient and economical postal service.

H.Rep., *supra,* at 3650. It also stated:

[T]he only solution to these problems is fundamental reform that puts complete responsibility in a single place, with appropriate safeguards against abuse of that responsibility.

*Id.* at 3653.

The Senate agreed. Its report stated:

[The Act] is not a halfway measure. Its objective is to establish a postal structure and a method of operating that will entrust the management of the U.S. Postal Service, within broad policy guidelines designed to protect the ordinary mailer, to responsible public officials.

Sen.Rep., *supra,* at 3.

Thus modernization and managerial freedom were prime Congressional objectives.

### C.

It is also evident that Congress anticipated that rates and classifications would be changed as a result of the development of more efficient systems and that the Postal Service would be involved in that process.

The interrelationship between rates and classifications changes and the modernization of postal services was discussed in the House Report which stated:

Since the Postal Service will be required to provide postal services "at reasonable and equitable rates and fees," massive and far-reaching improvement in postal efficiency must be achieved before a self-supporting Postal Service becomes a reality.

H.Rep., *supra,* at 3665.

Ample evidence is available to show that Congress intended for the Postal Service to be involved with rate and classification changes.

Most dramatic is the fact that the Act very explicitly states that the Postal Service and not the Commission has the final authority to set rates and classifications. The Act provides:

Upon receiving a recommended decision from the Postal Rate Commission, the Governors [of the Postal Service] may approve, allow under protest, reject, or modify that decision. 39 U.S.C. § 3625.[3]

Moreover, there is evidence that shows that Congress intended for the Postal Service to provide the Commission with information so that the Commission could make decisions about rate and classification changes.

For example, one of Congress's concerns about the pre-1970 rate-making process was that costs attributable to a particular class of mail were often not charged to that class of mail. Under the Act, each class of mail was to bear its own costs. 39 U.S.C. § 3622. While perhaps a simple theory, it was anticipated that implementation of this mandate would be difficult because, under the accounting system used by the Post Office Department, costs could not readily be attributed to a particular class of mail. President's Commission, *supra,* at 132–35. The Postal Service was thus empowered and given a Congressional mandate to develop an accounting system that permitted cost attribution so rates could be accurately set. 39 U.S.C. §§ 2008, 2009, 2401. *See Association of American Publishers v. Governors of U.S. Postal Service,* 157 U.S.App.D.C. 397, 485 F.2d 768 (1973).

I therefore disagree with the Court of Appeals for the District of Columbia, which implied in language the majority quotes, that rates and classifications were Commis-

---

**3.** The full text provides that in the event that the Postal Service wishes to reject or modify a decision, the Postal Service must resubmit its request and if still dissatisfied it may modify or reject the decision if it is inconsistent with the Act or if it will produce insufficient revenues.

sion business and that the Postal Service was to have nothing to do with those matters.[4] *National Association of Greeting Card Publishers v. United States Postal Service,* 186 U.S.App.D.C. 331, 569 F.2d 470 (1976), *vacated in part,* 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977). The Act does not provide for such a sharp delineation of duties. Indeed, the majority concedes that the Postal Service has an independent role to play in rate and classification making when it recognizes the right of the Postal Service to develop, plan and implement a "test plan" that would provide information that would be used by the Commission. Majority's opinion, *supra,* at 1377.[5]

It is against this backdrop of Congressional concern that the responsibility for experimentation should be evaluated. Alone, it would support the Postal Service's authority to engage in the rate and classification experiment challenged by the UPS, an experiment which was designed to develop data on new techniques for the handling of parcel post and the effect of different rates and classifications.

### D.

The majority argues that regardless of this history, the existence of the Commission demonstrates a Congressional intent to restrict the power of the Postal Service to undertake experiments. I do not agree. It is my belief that the legislative materials discussed above compel any court to exercise caution before it decides that Congress intended to place a restraint on the Postal Service's management authority. Indeed, I believe that this history, which demonstrates an overwhelming concern with deregulation, almost compels us to hold that management flexibility exists, unless contrary evidence is provided. *Cf.*

*United Telegraph Workers v. F.C.C.,* 141 U.S.App.D.C. 190, 194, 436 F.2d 920, 924 (1972) ("This expression of congressional desire that the Commission encourage technological innovation requires us to demand a compelling showing of legislative prohibition before we strike down an experiment . . . which is designed to furnish the information input that makes such innovation possible.").

It is my view that the legislative materials do not provide the evidence necessary to reject the presumption of flexibility and to hold that Congress intended to have the Commission supervise experiments. Moreover, these materials provide positive support for my conclusion that supervision of experiments was not one of the duties envisioned for the Commission.

As I note above, the descriptions of the Commission's responsibilities contained in the legislative documents are somewhat lacking as they contain no reference to rate and classification experiments. However, read in their totality they suggest that the Commission was given the responsibility of setting national policy on rates and classifications and acting as an overseer to ensure that these policies were properly implemented. *See* H.Rep., *supra,* at 3666, 3667–68, 3692–95 and Sen.Rep., *supra,* at 13–17. To be sure, at times this responsibility would include the supervision of permanent rate or classification changes that would have a limited impact, for example, a subsidized rate for sending a particular type of periodical. However, the duty to supervise these changes is derived from the broader duties. In the case of an experiment, such as the one challenged here, whose object is the testing of new systems of handling mail, these broader duties are not implicated. This suggests that the duty to supervise experiments was not included among the Commission's responsibilities.

---

4. I do not mean to suggest by this point that the Commission does not have substantial and dominant authority in the area of rate and classification making. My point is simply that Congress intended for the Postal Service to have a significant involvement in this process, especially with regard to the development of data to be considered by the Commission.

5. The majority has reserved for another day the question of whether the Postal Service may conduct, even with Commission approval, marketplace experiments. However, the majority does not seem disturbed by the Postal Service's involvement in rates and classifications; it is merely the type of involvement it questions.

Sections 3622 and 3623 also make no reference to rate and classification experiments. Again, read in their totality they give us some assistance. For example, the statutes outline a specific process which the Commission must follow when it makes rate and classification decisions. Section 3624 further provides that the Commission can approve a request by the Postal Service only after an opportunity for a hearing conducted pursuant to the Administrative Procedure Act has been granted.[6] This process is simply not a productive one when a managerial decision as to the necessity for the development of data on a system change is being made. Moreover, the information that would be necessary to have a meaningful hearing on the desirability of the change would not be available until the experiment is conducted. Cf. *Delta Airlines v. CAB,* 147 U.S.App.D.C. 272, 276, 455 F.2d 1340, 1344 (1971) ("The CAB in reality is not able to investigate without testing how this experimental tariff actually works.") and *American Airlines v. CAB,* 123 U.S.App. D.C. 310, 319, 359 F.2d 624, 633 *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966) ("A month of experience will be worth a year of hearings.").

In addition, I envision that during the process of an experiment the Postal Service might wish to modify some portion of the experimental design on rates or classifications. Under the majority's reading of the statute, hearings would be necessary. I cannot believe Congress intended so absurd a result. For example, during the course of the experiment challenged here the Postal Service might decide that packages were falling in different weight groups than originally anticipated and may wish to change the weight classifications in the experiment. It would simply make no sense to have a hearing to make the modification.

Another indication that Congress did not intend to have the Commission review experiments is also found in sections 3622 and 3623. These provisions, section 3622(b) and section 3623(c), state that the Commission's decisions are to be made in accordance with the policies of the Act and with a number of itemized factors.[7] These factors, which include factors such as the relative value of the kind of mail transmitted and the effect of rate increases upon the general public are not generally applicable to experiments. *E.g.,* 39 U.S.C. § 3622(b)(4) and § 3623 (c)(2). Moreover, some of the factors involve cost evaluations that cannot be made before an experiment is complete. *39 U.S.C. § 3622(b)(5) & (6).*

Finally, an examination of the reasons that were given to support the Commission's creation leads me to conclude that the Commission was not designed to supervise experiments. These reasons are, for the most part, relevant only when major policy decisions are made, when the integrity of the Postal Service could be threatened, or when one of the Act's underlying purposes could be frustrated. These are not concerns which arise during an experiment.

First, many members of Congress were concerned that while they wanted the Postal Service to operate as an efficient business enterprise, they were concerned that the

> Postal Service in fact and shall be operated as a service to the American people, not as a business enterprise, designed to provide excellent postal service.

Sen.Rep., *supra,* at 4.

It was felt that the Commission would be able to strike the necessary balance, and would ensure that postal rates reflected not only management objectives but also served broader public purposes, e. g., certain nonprofit organizations might be given special rates. These broader public purposes are not implicated by an experiment.

---

**6.** 39 U.S.C. § 3624 provides:

(a) The Postal Rate Commission shall promptly consider a request made under section 3622 or 3623 of this title, except that the Commission shall not recommend a decision until the opportunity for a hearing on the record under sections 556 and 557 of title 5

has been accorded to the Postal Service, users of the mails, and an officer of the Commission who shall be required to represent the interests of the general public.

**7.** *See* Majority opinion, *supra,* at 1374–1375 n.4, & n.5 for the text of the statute.

A second impetus for the establishment of the Commission was the sentiment that some distance from the day-to-day operations of the Postal Service might be necessary to make sound business decisions on rates. *See* Majority's Opinion, *supra,* at 1373–1374. Again an experiment would not tamper with this concern, and would, if anything, permit the Postal Service to give the Commission information it needs to perform this function.

Congress was also concerned about the impact political pressure had had on rate and classification determinations. Under the reorganization, Congress wished to design a system that would be as free from political influence as possible, where experts could make decisions based on the technical problems of running the postal system and not the effectiveness of particular lobbyists. *See, e. g.,* Remarks, Sen. McGee, 116 Cong.Rec. 26955 (1970).

· The Commission was seen as a solution to this problem. The House report stated:

> The Commission provides an invaluable buffer between the management of the Postal Service and the possible influence of partisan politics. Insulation from partisan politics is one of the principal purposes to be served.

H.Rep., *supra,* at 3660.

It is conceivable that partisan politics could influence the Postal Service's decision to select particular participants in an experiment which used cheaper rates. But there is no showing of partisan politics in the pleadings or the stipulated facts in this case. To the contrary, it is clear that this "Local Parcel Service Test Plan" was created for managerial purposes.[8] The authority to undertake limited and temporary experiments does not permit the return to the days when every interest group imaginable had special permanent rates established for them. Moreover, political influence on the decision to undertake an experiment or to choose a participant is simply not as dangerous as on decisions where national policy is made.

In our zeal to protect the public we must remember that the public is not always protected by more regulation and more supervision. That is the overwhelming message of the Postal Reorganization Act. Indeed, in this case, the effort to impose regulation upon the Postal Service and to require it to seek Commission review is spearheaded not by a representative of the general public but by one of the Postal Service's major competitors, the United Parcel Service.

· The majority rejects the present plan because it hypothesizes that the authority to approve an experiment for twenty shippers in five metropolitan areas "would · permit unregulated changes in rates and mail classification at *any* time and under *any* circumstance whereby less than all members of the public were entitled to benefits stemming from such changes." Majority Opinion, *supra,* at 1377. This "logic" is the worst example of the parade of horribles. If the Postal Service, under the rubric of experimentation, attempted to set up permanent or specialized rates for any individ-

---

**8.** The Postal Service outline of the experiment indicates the following:

Test Objectives

A. The first objective is to determine the feasibility of the new operations configuration affecting:
1. Acceptance procedures.
2. Local Holdout and BMC processing.
3. MVS operations.

B. The second objective is to determine the costs associated with reduced handlings which result from the new operations configuration.

C. The third objective is to determine the service and cost impact on the mailer and to measure mailer acceptance of this impact.

D. The fourth objective is to analyze the service within the context of our continuing review of the structure of traditional services. Issues to be explored are:
1. Whether nearer Parcel Post zones are in need of an adjustment?
2. Whether volume requirements for Bulk Parcel Post are in need of adjustment?
3. Whether pick-up (not plant load) offered as an option or offered as a feature (no option) of the service is needed?
4. Whether further refinements are needed in the single piece third class and zone-rated, fourth class classifications and rate design?

ual or group presumably a court would not be misled by a label marked "experiment." Moreover, if the Postal Service abused the limited authority that I believe Congress intended for it to have, the Commission has the power under 39 U.S.C. § 3662 to review and prohibit Postal Service actions that circumvent the policies of the Act.

One final point raised by the majority. I believe 39 U.S.C. § 403, which proscribes the "unreasonable discrimination" "preferences," provides no assistance in resolving the question in this appeal. Majority's Opinion, *supra,* at 1377. First, any experiment will discriminate against other users of the postal system whether or not the Commission approves it. And second, the section only prevents "unreasonable discrimination." A properly conducted marketplace experiment is certainly not an "unreasonable" type of "discrimination" or "preference."

### IV.

I believe the experiments are a permissible exercise of Postal Service authority. I do not believe, as the majority concludes, that the Congress, in its attempt to free the postal system of constraints so that it might operate as a modern and efficient enterprise, intended to require the Postal Service to undertake the time-consuming process of hearings and Commission review in order to develop and provide data for the Commission's rate-making judgments.

One of the nation's leading scholars on administrative law, Dean James O. Freedman, in his classic treatise, *Crisis and Legitimacy: The Administrative Process and the American Government,* 261–62 (1978), has stressed:

The legitimacy of the administrative process cannot turn, then, upon its non-conformity to a simplistic version . . Rather, it must be tested pragmatically, by the responsiveness of administrative institutions to the most fundamental principles of a democratic society and by the degree to which administrative institutions meet the nations highest aspirations for justice and effective government.

Unfortunately in this case, despite the Congressional dream and design to bring flexibility, creativity and managerial efficiency to the Postal Service, the public's aspirations have once again been dashed. The public has been precluded from having within the Postal Service "justice and effective government."

I therefore dissent.[9]

---

**9.** The majority has decided this appeal without determining whether the Postal Service has the authority to undertake the experiment even if it seeks Commission approval. At oral argument the Postal Service indicated that it still had an interest in conducting this specific experiment. As a result of the majority's decision, the Postal Service will have to submit the proposed experiment to the Commission and participate in hearings with the possibility that it will be determined after a second challenge, a second decision by a district court and a second appeal to this court, that the Postal Service cannot undertake marketplace experiments even with Commission approval. (I would of course disagree with that conclusion). I believe this would be a waste of the resources of the Postal Service, the Commission and the judiciary. The majority should reach this issue.