**UNITED PARCEL SERVICE, INC., a New York Corporation,**

**United Parcel Service, Inc., an Ohio Corporation**

**and**

**United Parcel Service of America, Inc., a Delaware Corporation,**

**v.**

**UNITED STATES POSTAL SERVICE, Appellant.**

**No. 79–1359.**

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1979.

Decided Feb. 5, 1980.

Louis A. Cox, Gen. Counsel, Washington, D. C., Frances G. Beck (argued), Asst. Gen. Counsel, Frank R. Heselton, U. S. Postal Service, Washington, D. C., for appellant.

George P. Williams, III, Robert L. Kendall, Jr. (argued), John E. McKeever, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and ZIEGLER,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The United States Postal Service appeals from an order enjoining it, pending final hearing, from instituting on a temporary basis changes in rates and in the mail classification schedule relating to fourth class zone-rate parcel post, proposed by it in Postal Rate Commission Docket No. MC78–1.[1] The plaintiffs, United Parcel Service, Inc., a New York corporation, United Parcel Service, Inc., an Ohio corporation, and United Parcel Service of America, Inc., a Delaware corporation, (collectively UPS) are competitors of the Postal Service in the parcel delivery business who allege that the temporary institution ˙ of the proposed

---

* Honorable Donald E. Ziegler, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. Notice of the proposal for temporary institution of the change was published in the Federal Register. 44 Fed.Reg. 9,819 (1979).

changes would violate express provisions of the Postal Reorganization Act, as amended by the Postal Reorganization Act Amendments of 1976.[2] We affirm the grant of preliminary injunction.

## I. *Facts and Procedural History*

On September 8, 1978 the Postal Service filed with the Postal Rate Commission (the Commission) a document entitled "Request of the United States Postal Service for a Recommended Decision on Changes in the Domestic Mail Classification Schedule." The Commission thereafter published a notice of the filing and of the commencement of Commission Docket No. MC78–1 to consider this request.[3] UPS and others participated in proceedings in Commission Docket No. MC78–1. While that proceeding was still open the Postal Service announced that on February 25, 1979, it would place the changes proposed in the request into effect on a temporary basis. UPS then filed its Complaint and moved for a preliminary injunction. At the time of the hearing on UPS's motion for a preliminary injunction, and at the time of argument of this appeal, the Commission had not acted on the Postal Service request. We are advised, however, that on December 5, 1979, the Commission issued its Opinion and Recommended Decision in Docket No. MC78–1, in which it recommends to the Governors of the Postal Service (Governors) that they reject the proposed changes.[4] We have not been advised of any action by the Governors on the Commission's recommended decision.

The Postal Service request in MC78–1, had it gone into effect, would have established, in place of two subclasses of zone-rate parcel post currently in effect, four such subclasses. Thus the request would have left the single piece class and rate for parcel post unchanged, but would have changed the bulk parcel post class by reducing the packages tendered requirement from 300 to 50, and by subdividing the bulk parcel post class into three subclasses:

(1) new bulk rates and class for packages mailed within a Bulk Mailing Center Zone (intra-BMC zone);[5]

(2) new bulk rates and class for packages mailed between Bulk Mailing Center zones (inter-BMC zone); and

(3) new class and rates for non-machinable parcels, with an added per package surcharge for such parcels.

Single piece parcel post is now available to all shippers on the basis of a rate schedule derived from the weight of each parcel and the distance of the zone to which the parcel is to be carried. Bulk parcel post is currently available only to shippers who tender a minimum of 300 parcels at one time and who meet certain other entry requirements. The bulk parcel post subclass permits large volume shippers to calculate postage based on the average weight of all parcels tendered for each zone rather than requiring that each parcel be weighed individually. The present bulk rate is the single parcel rate for a piece having a weight equal to the average weight per piece for each zone. There is presently no surcharge for non-machinable parcels. If the Request had become effective the per package rate for inter-BMC zone and intra-BMC zone bulk parcel post, which is now equal, on average, to the single piece parcel post rate, would, with limited exceptions, be substantially lower. Moreover, the new lower rates would be available to a greater number of bulk shippers because of the reduction of

---

**2.** 39 U.S.C. §§ 101–5605 (1970) *as amended by* Postal Reorganization Act Amendments of 1976, Pub.L.No.94–421, 90 Stat. 1303 (1976). The UPS Complaint also charged breach of a settlement proposal approved by the Postal Rate Commission, and an error in computation of the date from which the waiting period should be calculated. The district court did not reach these allegations in ruling on the application for a preliminary injunction.

**3.** 43 Fed.Reg. 41,441 (1978).

**4.** *See* 39 U.S.C. § 3624(d) (1976) (directing Commission to transmit recommended decision to Governors). The statute further provides for subsequent actions upon the Commission's recommended decision by the Governors. *Id.* § 3625; *see* Part III, *infra.*

**5.** A Bulk Mailing Center is a Postal Service facility designed to process parcels and mail tendered in bulk rather than individually. There are 21 such centers in the United States.

the bulk entry requirement from 300 to 50 packages. If the Request had become effective there also would have been for the first time a new class of parcels defined as non-machinable and surcharge of $1.50 over the single piece rate for each non-machinable parcel.

The February 15, 1979, announcement of the Postal Service that it would implement the proposed changes on February 25, 1979, relied for authority on section 3641(e) of the statute, which provides:

> If the Postal Rate Commission does not transmit to the Governors within 90 days after the Postal Service has submitted, or within 30 days after the Postal Service has resubmitted, to the Commission a request for a recommended decision on a change in the mail classification schedule (after such schedule is established under section 3623 of this title), the Postal Service, upon 10 days' notice in the Federal Register, may place into effect temporary changes in the mail classification schedule in accordance with proposed changes under consideration by the Commission. Any temporary change shall be effective for a period ending not later than 30 days after the Commission has transmitted its recommended decision to the Governors.

39 U.S.C. § 3641(e). It was the Postal Service's position that its request in MC78–1 was for a change in the mail classification schedule, that the request had been before the Commission for over 90 days, and that the Service thus was free to put the change into effect temporarily.

UPS in its Complaint, on the other hand, took the position that what the Postal Service proposed was a change in rates and therefore that section 3641(e) was not the governing section of the Act. Rather, it urges that the governing sections are sections 3622, 3624(c)(1) and 3641(a). Section 3622 authorizes the Postal Service to request the Commission to submit to the Governors recommended decisions on changes in postage rates, and authorizes the Com-

mission to make any such recommended decision on changes "in rates or fees in each class of mail or type of service." *Id.* § 3622(b). Section 3624(c)(1) directs that the Commission shall transmit its recommendation to the Governors no later than ten months after receiving a Request to change rates or fees under section 3622 from the Postal Service. Id. § 3624(c)(1). Section 3641(a) authorizes the Postal Service to establish temporary changes in rates of postages and in fees for postal services

> [i]n any case in which the Postal Rate Commission fails to transmit a recommended decision on a change in rates of postage or in fees for postal service to the Governors in accordance with section 3624(c).

*Id.* § 3641(a). Reading sections 3641(a) and 3624(c) together, it is apparent that a temporary change in rates of postage or fees for postal service cannot be put into effect until it has been before the Commission for at least ten months without transmittal of a recommended decision. Section 3624(c)(2) permits the Commission to extend the ten month period if the Postal Service has unreasonably delayed the proceedings, and in MC78–1 it extended the period on that ground by five months.[6] If the Commission was correct in treating the MC78–1 Request as a request for a change in rates of postage or fees for postal service, then the earliest time when a temporary rate could go into effect would be early in December 1979. By that date, as we have noted, the Commission had acted adversely upon the Request.

· Setting aside, for the moment, other factors bearing upon the propriety of pendente lite injunctive relief, it is apparent that the legal issue tendered by UPS is whether the Request before the Commission in Docket No. MC78–1 is for a change in the mail classification schedule governed by the 90-day waiting period prescribed in section 3641(e), or for a rate change governed by the fifteen-month waiting period imposed

---

**6.** Postal Rate Comm'n, Docket No. MC78–1, Order 288 (July 3, 1979); Postal Rate Comm'n, Docket No. MC78–1, Order 280 (May 18, 1979).

by the Commission pursuant to sections 3624(c)(1), 3624(c)(2), and 3641(a). The district court, without deciding the matter finally, concluded that UPS had a reasonable probability of success in convincing the court at final hearing that the longer waiting period applied. That is the principal issue tendered by the Postal Service in this appeal.

## II. *Mootness*

As we noted above, the Commission sent its recommended decision to the Governors on December 5, 1979. Even if the Postal Service is correct that section 3641(e) applies, under the last sentence of that subsection the temporary change which it proposed on February 15, 1979 would expire thirty days after the December 5, 1979 transmittal date. Thus the temporary changes which were noticed by the Postal Service in the Federal Register on February 15, 1979, will not go into effect in any event. The preliminary injunction is addressed only to these temporary changes, and since they are now inoperative even absent the preliminary injunction, the Postal Service has moved in this court to dissolve the preliminary injunction as moot and remand the case to the district court.

The case is, of course, still pending in the district court. Nothing is before us except an appeal from the grant of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1). Thus we construe the Postal Service's motion as a suggestion that the appeal from the preliminary injunction is moot, and that the preliminary injunction should not be reviewed on the merits, but should be vacated without prejudice to further proceedings in the district court.

UPS opposes the motion to vacate the preliminary injunction. It points out that under the Postal Reorganization Act as amended, the Governors may approve the Commission's recommended decision, modify it, allow it to go into effect under protest, or reject it. 39 U.S.C. § 3625(a). If the Governors approve it, allow it to go into effect under protest, or modify it, their decision is reviewable in a court of appeals

pursuant to 39 U.S.C. § 3628. *See id.* § 3625(c). If the Governors reject the Commission's recommended decision, however, the Postal Service may resubmit the proposed changes to the Commission. *Id.* § 3625(d). In this instance the Commission recommended that the Governors reject the Postal Service's proposed changes. A rejection of that recommendation by the Governors would in all likelihood produce a resubmission to the Commission. In that event, UPS urges, the Postal Service may once again take the position that section 3641(e) applies, and that thirty days after such resubmission it can give a new ten-day notice of a temporary change. There is no provision in the Act for any temporary implementation of a proposed rate change after rejection of a recommended Commission decision by the Governors. *Compare* 39 U.S.C. § 3641(a) *with id.* § 3641(e). Thus, UPS contends, the dispute between it and the Postal Service is not only likely to recur, but is likely to recur with respect to the same proposed temporary changes.

If this were an appeal from a final judgment, in which the legal issue of the applicability of section 3641(e) or sections 3624(c)(1), 3624(c)(2) and 3641(a) were squarely and necessarily to be decided, we would find completely persuasive UPS's argument that there is a sufficient likelihood of recurrence of the dispute over the appropriate waiting period that it ought to be decided. Certainly the dispute between the parties seems live enough to justify declaratory, if not injunctive, relief. However, that is not the posture of this appeal. In granting a preliminary injunction the district court decided no more than that UPS was likely to succeed on the merits, that it had shown the likelihood of irreparable injury, and that the balance of conveniences between its interests and those of the defendant and public weighed in the favor of UPS. Our scope of review over the order appealed from is commensurately more narrow than over a final judgment. We need go no further than is necessary to decide

the precise matter on appeal.[7] But so long as a case is not moot in the sense of a complete absence of a case or controversy, that rule is only one of orderly judicial administration. When an appeal is taken from an order made appealable by statute, we have all the powers with respect to that order listed in 28 U.S.C. § 2106. *McCreary Tire & Rubber Co. v. CEAT S.p.A.*, 501 F.2d 1032, 1037–38 (3d Cir. 1974); *Johnson v. Alldredge*, 488 F.2d 820, 822–23 (3d Cir. 1973), *cert. denied sub nom. Cronrath v. Johnson*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974); *cf. Hurwitz v. Directors Guild of America, Inc.*, 364 F.2d 67, 69–70 (2d Cir.) (general rule limiting scope of review of interlocutory appeal is subject to exception permitting dismissal of complaint of case without merit), *cert. denied*, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966). Granting our power under section 2106 to pass upon the legal issue in dispute,[8] the question is whether in this instance that power should be exercised. The answer turns, we think, on whether, in our judgment, that legal issue might be seen in any different light after final hearing than before. We think it would not. While other issues bearing upon the propriety of injunctive relief, such as the likelihood of irreparable harm to UPS or the effect on Postal Service operations, might appear in a different light after a full trial, the issue of which waiting period applies to the request filed with the Commission on Docket No. MC78–1 is a pure question of law. It is, moreover, a question intimately related to the merits of the grant of preliminary injunctive relief. We conclude, therefore, that it should be decided at this time.

### III. *The Structure of the Regulatory Scheme*

In *United Parcel Service, Inc. v. United States Postal Service (UPS I)*, 604 F.2d 1370

(3d Cir. 1979), we considered the basic structure of the Postal Reorganization Act. We held that the Postal Service could not bring about a change in either rates or classifications of mail without first submitting the proposed change to the Commission. We rejected the contention that the Postal Service could bypass the complex regulatory scheme of the Act by calling a change in the average weight pricing scheme for bulk mailing of parcels an "experiment." We held that the proposed "experiment" involved both rate and classification aspects, and that the Commission could not be bypassed. *Id.* at 1375–79. Judge Higginbotham dissented, but only on the ground that the Act permitted limited experimentation outside of the regulatory scheme. He did not disagree with the majority's conclusion that the "experiment" had both rate and classification aspects. *Id.* at 1383–88. What the Postal Service attempted to accomplish by its proposal to temporarily implement the terms of Request MC78–1 is closely related to what it attempted to accomplish on a more limited scale in the "experiment" with which we dealt in *UPS I*. In this case, however, the Postal Service did not attempt to bypass the Commission, but rather attempted to take advantage of temporary authority granted to it in instances of Commission delay in the disposition of a request. The different posture of the case requires a somewhat fuller review of the legislative scheme than was necessary in *UPS I*.

Prior to 1970, Congress retained responsibility for the establishment of postage rates and classifications of postal service. This practice resulted, especially in times of inflation, in chronic postal revenue deficits. *See, e. g., Proposed Reorg. of Postal Establishment to Provide for Efficient and Eco-*

---

7. *E. g., Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 878–80 (3d Cir. 1977); *Caterpillar Tractor Co. v. International Harvester Co.*, 120 F.2d 82, 86 (3d Cir. 1941).

8. That section provides that
   [t]he Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, de-

cree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.
28 U.S.C. § 2106 (1976).

*nomical Postal Service: Hearings on H.R. 17070 Before the Senate Comm. on Post Office and Civ. Serv.*, 91st Cong., 1st Sess. 503, 507 (1969) (statement of Postmaster General Winton Blount) (urging Congress to provide mechanism for institution of temporary rates). The Postal Reorganization Act of 1970 was intended to alleviate this deficiency by creating an independent Postal Service for which rates and classifications could be more efficiently established and amended. *See* H.R.Rep.No.91–1104, *reprinted in* [1970] U.S.Code Cong. & Admin. News, pp. 3649, 3650–51, 3667–69 (accompanying H.R.17070, the 1970 Act). The Act established an independent Postal Service, controlled and directed by nine Governors, who are appointed by the President for staggered nine-year terms. These Governors, along with their appointees, the Postmaster General and Deputy Postmaster General, comprise the Service's Board of Governors. 39 U.S.C. § 202 (1976); H.R. Conf.Rep.No.91–1363, *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 3712, 3712 (accompanying H.R.17070, the 1970 Act); *see United Parcel Serv. v. United States Postal Serv. (UPS I)*, 455 F. Supp. 857, 860 (E.D.Pa.1978), *aff'd*, 604 F.2d 1370 (3d Cir. 1979). The Act also established an independent quasi-regulatory body, the Postal Rate Commission, which has authority to oversee changes in rates, classifications, and services. 39 U.S.C. §§ 3601–3604. Before instituting any change in rates or classifications, the Postal Service must submit a request for a recommended decision to the Commission which holds evidentiary hearings under the terms of the Administrative Procedure Act and evaluates the proposal of the Postal Service. *See id.* §§ 3621–3622, 3624. The Governors may approve, reject, allow under protest, or in some circumstances modify the recommended decision. *Id.* § 3625. The 1970 Act, however, imposed no time limit on the Commission's action on Postal Service requests. *Compare* Postal Reorganization Act of 1970, Pub.L.No.91–375, 84 Stat. 719, *codified in* 39 U.S.C. § 3624 (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 842, 894 *with* Postal Reorganization Act Amendments of 1976, Pub.

L.No.94–421, § 6(a), 90 Stat. 1303 *codified in* 39 U.S.C. § 3624 (1976) (adding subsection (c) requiring Commission to act within 10 months), *reprinted in* [1976] U.S.Code Cong. & Admin.News at 90 Stat. 1306.

However, the 1970 Act did permit putting into effect temporarily proposed changes in either rates or classifications 90 days after the request had been filed with the Commission. Postal Reorganization Act of 1970, Pub.L.No.91–375, 84 Stat. 719, *codified in* 39 U.S.C. § 3641(a) (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 842, 896–97. The 1970 Act had also established a ceiling on temporary rates of the lesser of the proposed rate or a one-third increase over the existing rates, notwithstanding that a higher permanent rate had been requested. *See* Postal Reorganization Act of 1970, Pub.L.No.91–375, 84 Stat. 719, *codified in* 39 U.S.C. § 3641 (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 842, 897. The deficit continued to increase and the Service requested increased permanent rates in order to comply with the statutory mandate that the Service be self-supporting. Because there was no time limit within which the Commission was required to act, however, the Service was operated on a perpetually temporary rate scheme, filing for further increases in rates as soon as the prior request became permanent and instituting ever higher rates 90 days after each filing. This was criticized as giving the Service the control over rates that the Commission should have been exercising. H.R.Rep.No.94–391, 94th Cong., 1st Sess. *reprinted in Legislative History of the Postal Reorganization Act Amendments of 1976* at 43, 51 [hereinafter *Legislative History*].

Congress' overriding concern in 1976 thus was with the continuing deficits of the Postal Service. The Senate Report indicates that the three problems to be remedied by the amendments were reduced service, increased rates, and the operating deficit, all interrelated shortcomings of the system. S.Rep.No.94–966, 94th Cong., 2d Sess. 1–2, *reprinted in* [1976] U.S.Code Cong. &

Ad.News, pp. 2400, 2400–01. In hearings on the House version of the 1976 Amendments, the Chairman of the Commission noted that because the requirement of a formal trial-type hearing applied to its deliberations, it was impossible for the Commission to reach a recommended decision within the 90-day waiting period of the 1970 Act. *Proposal to Amend Postal Reorg. Act of 1970: Hearings on H.R.15511 Before the House Comm. on Post Office and Civ. Serv.*, 93d Cong., 2d Sess. 107, 111 (1974) (statement of Fred Rhodes, Chairman of Postal Rate Commission). The Chairman admitted that the Commission was unable to control rates as long as the Postal Service could institute temporary rates so quickly and suggested that Congress adopt a six-month waiting period with respect to rate and classification changes. *Id.* at 111, 131–34. The House version of the 1976 bill would have increased the waiting period for temporary instituting of both rates and classifications to 10 months, by amending section 3624 to require Commission action within that period of time, and section 3641 to forestall earlier imposition of temporary changes. *See* H.R.8603 §§ 7(a), 8(a), 94th Cong., 2d Sess., *reprinted in Legislative History* at 30. However, under the amended version, temporary rates would not be subject to the 1970 Act's one-third increase ceiling, but instead would be limited to the maximum amount requested as a permanent rate, which the then-Chairman of the Commission argued would give the Service needed control over revenues. *See* Letter from Clyde S. DuPont, Chairman of Postal Rate Commission, to Hon. David N. Henderson, Chairman of House Committee, *reprinted in Legislative History* at 64, 66.

■ The Senate version of the bill, which was adopted in relevant part by the Conference Committee, permitted temporary classification changes to be instituted after 90 days, and made only temporary rate changes subject to the ten-month waiting period. *See* H.R.8603 §§ 5(a), 6(a), *reprinted in Legislative History* at 243, 276–79 (Senate amendments). Although the reasons behind this distinction are not clear, there are two possible explanations. First, because the major problems with the 1970 Act were the rising deficit and slow pace of the Commission, which resulted in overuse of the temporary rate authority, it may be that the Senate did not view a temporary classification change as a problem needing a remedy. If a change in classification is not a financial question, or if it has only a limited effect on finances, then changes in classification may not have been viewed as responsible in any way for the fiscal plight of the Postal Service. Second, the Senate Report, after noting that classification changes will remain within the original 90-day provision, commented that "[t]he Postal Service and the Postal Rate Commission are working closely on the new classification schedule, which will be phased in for the different classes over a three or four-year period." S.Rep.No.94–966, 94th Cong., 2d Sess. 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News at p. 2412. If it is true that the Postal Service and Commission were developing a new classification schedule jointly, then the Postal Service would have been highly unlikely to make use of the permissive authority to institute temporary changes in classification. Moreover, the perceived infrequency of classification changes or the less complex proof required before the Commission may have led Congress to believe that 90 days would be an adequate time to afford the Commission to act upon proposed classification changes. Whatever the reasoning behind the distinction, the major problem faced by the Service prior to 1976 concerned rates and revenues; in reading and interpreting the Act as amended, rate changes must be viewed in that regulatory context.

The Conference Report only notes in passing that the Senate version was adopted; it is otherwise not helpful with regard to legislative intent. *See* H.R.Conf.Rep.No. 94–1444, 94th Cong., 2d Sess. 16–17, *reprinted in* [1976] U.S.Code Cong. & Admin.News at pp. 2434, 2438. The debates in the Senate

underscore that body's concern with rates and with the overuse by the Postal Service of the temporary rate authority, but are of no further aid. *See* 122 Cong.Rec. 27,089 (1976) (remarks of Senator Gale W. McGee, Chairman of Committee on Post Office and Civil Service) (temporary authority less likely to be used; Act intended to afford relief to ordinary users of mails). However, ten months was generally regarded as the appropriate time period needed for Commission action in rate cases. Senator McGee pointed out that had there been no delays by the Commission, the Service could have erased its deficit, and that the ten-month requirement would speed the actions of the Commission, which was otherwise creating a one-third increase ceiling for periods of time far in excess of ten months and which served to worsen the revenue shortfall. *Proposed Postal Reorg. Amendments of 1976: Hearings on S. 2844 Before the Senate Comm. on Post Office and Civ. Serv.*, Part 4, 94th Cong., 2d Sess. 73–74 (Apr. 20, 1976) (statement of Senator Gale W. McGee, Chairman of Committee on Post Office and Civil Service). Moreover, Senator McGee pointed out on the Senate floor that the longest period of Commission deliberations on a proposed rate change was nine and one-half months, and thus that the ten-month requirement was feasible. 122 Cong.Rec. 27,090–91 (1976).

It seems clear from this legislative history that the 1976 Amendments were intended to give the Commission an outside limit of ten months to act upon postal rate requests, and to prohibit the Postal Service from making temporary rate changes during that period. If, then, the request in Docket No. MC78–1 is for rate changes, it could not have been put in effect until it had been before the Commission for ten months.

▮ The Postal Service called the request a classification change. The Service argues that it alone has discretion to denominate a

request as a rate matter or a classification matter and that its denomination controls. If, however, the Postal Service had such unfettered discretion, the 1976 Amendments would have accomplished nothing, for it is difficult to conceive of any change in postal rates that could not be coupled with some minor or major change in the nature or extent of postal service. Moreover the Commission has rejected the contention that the Postal Service has such unfettered discretion. In exercising the power to extend the ten-month limit for the decision in Docket No. MC78–1, a power applicable only to requests for rate changes, *see* 39 U.S.C. § 3624(c)(2), the Commission observed:

> The Postal Service's formalistic argument that it submitted its Request as a proposed classification change pursuant to 39 U.S.C. § 3623 does not obviate the patent rate effects that would accompany implementation of its proposal in this docket.[1]

Postal Rate Comm'n, Docket No. MC78–1, Order No. 280 at 19 & n.1 (May 18, 1979); *see* 43 Fed.Reg. 41,441 (1978) (Commission's Notice of filing of Postal Service Request; Commission noting that certain aspects suggest request involves rate changes under § 3622).

Next the Postal Service urges that, assuming it has no such unfettered discretion, in this instance the request is either a pure classification change, or one in which classification aspects predominate and rate aspects are merely incidental. On the facts of this case there is, however, an air of unreality about the Postal Service position. Pressed at oral argument for examples of what might be regarded as pure classification changes, the only examples to which its counsel could refer were the recent changes in the permissible size of a first class letter. An example of a pure rate change would be the increase in the rate of postage on a first class letter from fifteen to twenty-five cents. The categories of rates and of classi-

---

1. Nor does this Commission's assignment of an "MC" docket number to the Service's Request obviate the intrinsic rate aspects of the proposal.

fications inevitably overlap in most other instances. One court has noted that:

> a classification is a "grouping" of mailing matter for the purpose of assigning it a specific rate or method of handling.

*National Ret. Teachers Ass'n v. United States Postal Serv.*, 430 F.Supp. 141, 146 (D.D.C.1977), aff'd, 193 U.S.App.D.C. 206, 593 F.2d 1360 (D.C.Cir.1979). That definition suggests that it is not possible to establish rates in the absence of classifications of service to which those rates apply. But the fact remains that Congress intended to subject changes in rates to a ten-month rather than a 90-day waiting period before they could be put into effect by unilateral Postal Service action.

Next the Postal Service argues that the rate aspects and the service classification aspects of its request are severable. That may be so, but the February 15, 1979 Federal Register notice did not so treat them. Admitting this, the Postal Service suggests that if it can treat the classification aspects as severable, and thus temporarily effective in ninety days, then it must be able to charge the proposed rate for the new service in the interim or else be forced to offer the new service without any increased cost. The logic of this suggestion escapes us. It is within the Postal Service's control whether or not to put a classification of service into effect, and we have no fear that it will not do so until it can collect revenue for the service. In any event, the request in Docket No. MC78–1 clearly does not have severable rate and classification aspects. It embodies a fundamental overhaul of the entire parcel post rate structure. Permitting it to go into effect after 90 days rather than ten months would undermine the regulatory scheme devised by Congress in the 1976 Amendments.

■ We conclude, as did the Commission, that the Request embodied in Docket No. MC78–1 is a request for a change in rates to which section 3624(c)(1) applies, and that the changes it proposes in parcel post rates cannot be put into effect until after the waiting time established in section 3641(a).

## IV. *Other Postal Service Contentions*

■ The remaining Postal Service contentions need not long detain us. It is argued that the district court erred in determining that UPS would be likely to suffer irreparable harm pending final hearing, and in concluding that the harm to the Postal Service and the public pendente lite did not outweigh any harm to UPS. The evidence presented at the hearing on the preliminary injunction suggests strongly, and perhaps compels, the conclusion that the proposed bulk parcel post rate schedule, which was designed for the express purpose of diverting millions of packages from UPS to the Postal Service, would in fact have that very effect. As to the harm flowing to the Postal Service and the public from the Postal Service's inability, during the statutory waiting period, to accomplish that diversion, we can only observe that the Ninety-Fourth Congress struck the balance when it gave the Commission ten months within which to decide on a recommended decision as to proposed changes in postal rates.

## V. *Conclusion*

The district court did not err in granting a preliminary injunction against the institution on a temporary basis of changes in rates and the mail classification schedule relating to fourth class zone-rate parcel post as proposed in Commission Docket No. MC78–1. The order appealed from will be affirmed without prejudice to an application to the district court for its modification in light of the present agency posture of the request in Docket No. MC78–1.