959 F.2d 1213
 AIR COURIER CONFERENCE OF AMERICA/INTERNATIONAL COMMITTEE,
International Express Carriers Conference, DHL Airways,
Inc., Dworkin-Cosell Interair Courier Services, Inc.,
Federal Express Corporation, Intertrade Courier
International, Inc., TNT Skypak, Inc., and UPS Air Forwarding, Inc.
v.
U.S. POSTAL SERVICE
Air Courier Conference of America/International Committee,
an Unincorporated Association, Appellant.
 No. 91-3216.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 19, 1991.
Decided March 13, 1992.
 
 John E. McKeever, Robert L. Kendall, Jr. (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant.
 Harold J. Hughes, Gen. Counsel, John L. DeWeerdt, Associate Gen. Counsel, William T. Alvis (argued), International Law Counsel, Eric P. Koetting, U.S. Postal Service, Washington, D.C., for appellee.
 Before: BECKER and HUTCHINSON, Circuit Judges, and FULLAM, District Judge*.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Air Courier Conference of America/International Committee (Air Courier) appeals a judgment upholding appellee United States Postal Service's (Postal Service's) rate reduction on one class of On-Demand Express Mail International Service. Air Courier argues that the Postal Reorganization Act (Act) requires the Postal Rate Commission (Commission) to review international mail rates. We think the text of the Act, read as a whole in light of its purpose and history, indicates otherwise. Our conclusion that the Act does not involve the Commission in establishing international rates is also supported both by the Postal Service's and the Commission's longstanding interpretation of the Act to that effect. We will therefore affirm the judgment of the district court.
 
 I.
 
 2
 Air Courier, a trade association composed of companies providing domestic and international expedited letter and parcel delivery service, along with another trade association and six individual international carriers[1] (collectively "plaintiffs"), filed a two-count complaint against the Postal Service in the United States District Court for the District of Delaware. Count one alleged that a permanent rate reduction for On-Demand Express Mail International Service from $18.00 per piece to $10.75 per piece for items weighing up to eight ounces was illegal because the Postal Service adopted the $10.75 rate without first submitting it to the Commission in accord with 39 U.S.C.A. § 3622 (West 1980). Count two alleged that the new rate of $10.75 for each item weighing eight ounces or less was a predatory price set below the Postal Service's cost of providing the service in violation of 39 U.S.C.A. §§ 101(d), 403(a), 403(c) (West 1980). The plaintiffs sought a permanent injunction prohibiting the Postal Service from using the $10.75 rate for On-Demand Express Mail International Service before review by the Commission or from operating that service at less than a reasonable rate.
 
 
 3
 Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Postal Service moved to dismiss count one for failure to state a claim upon which relief could be granted. It argued that 39 U.S.C.A. § 407(a) (West 1980) gives it power to establish international postage rates without Commission review. The plaintiffs opposed the motion to dismiss count one and filed a cross-motion for summary judgment. After briefing, the district court granted the Postal Service's motion to dismiss count one and denied plaintiffs' motion for summary judgment on that count. See Air Courier Conference of Am./Int'l Comm. v. United States Postal Serv., 762 F.Supp. 86, 92 (D.Del.1991). In its ruling in favor of the Postal Service, the district court deferred to the Postal Service's and the Commission's longstanding identical constructions of the Act holding the construction that gave the Postal Service unilateral authority to establish rates for international service was reasonable and not contrary to Congress's legislative intent.
 
 
 4
 Discovery on the plaintiffs' count two theory of predatory pricing in violation of sections 101(d), 403(a) and 403(d) followed. After the Postal Service raised the disputed rate on February 3, 1991, Air Courier and the other plaintiffs voluntarily dismissed count two. The district court then entered final judgment on count one. From that judgment Air Courier alone filed a timely notice of appeal.
 
 
 5
 We will affirm the order of the district court. Reading the Act as a whole, we think Congress's intent to place the power to "establish" rates for international mail in the Postal Service is reasonably plain from the statutory text. The legislative history of the relevant statutory provisions is ambiguous and certainly insufficient to alter our interpretation of the statutory text. Air Courier's reliance on cases, including our own, that deny the Postal Service unilateral power over domestic mail rates is misplaced because the statute treats domestic and international ratemaking differently. Finally, our decision is buttressed by the Postal Service's longstanding reasonable construction of the Act as giving it power to "establish" international rates--a construction the Commission concurs in. Our detailed reasoning follows.
 
 II.
 
 6
 The Postal Service is "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C.A. § 201 (West 1980). Its duties, as set forth by Congress, are to:
 
 
 7
 plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees. The Postal Service shall receive, transmit, and deliver throughout the United States, its territories and possessions, and, pursuant to arrangements entered into under sections 406 and 411 of this title, throughout the world, written and printed matter, parcels, and like materials and provide such other services incidental thereto as it finds appropriate to its functions and in the public interest. The Postal Service shall serve as nearly as practicable the entire population of the United States.
 
 
 8
 Id. § 403(a). The Postal Service is also charged with the efficient collection, sorting and delivery of mail to meet the needs of all types of mail users, as well as the duty to maintain accessible postal facilities. Id. § 403(b) (West 1980). Except as otherwise provided, the Postal Service is to do all this without "undue or unreasonable discrimination among users of the mails [or] undue or unreasonable preferences to any such user." Id. § 403(c).
 
 
 9
 Before the Act was adopted in 1970, the burden of setting domestic postal rates fell on Congress. See H.R.Rep. No. 1104, 91st Cong., 2d Sess. 5, reprinted in 1970 U.S.C.C.A.N. 3649, 3654; United Parcel Serv., Inc. v. United States Postal Serv., 604 F.2d 1370, 1374 (3d Cir.1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980). Congress had not, however, then involved itself in setting international rates. It left that task to the Postmaster General. 39 U.S.C.A. App. § 505(a) (West 1980).
 
 
 10
 The Act drastically changed the way domestic postal rates are established. Under it, domestic rate changes are first proposed by the Postal Service. 39 U.S.C.A. § 3622(a). The Postal Service submits its rate proposals to the Commission, id., a five-member body appointed by the President with the advice and consent of the Senate, id. § 3601(a) (West 1980). After hearings, see id. § 3624(a) (West 1980), the Commission transmits a recommended decision to the nine Governors of the Postal Service (Governors), id. § 3624(d) (West 1980). The Governors of the Postal Service are also appointed by the President with the advice and consent of the Senate. Id. § 202(a) (West Supp.1991). They, along with the Postmaster General and the Deputy Postmaster General, make up the Board of Governors of the Postal Service. The Board's task is to direct "[t]he exercise of the power of the Postal Service." Id.; id. § 202(c) & (d) (West 1980). The Postmaster General and his deputy, through members of the Board of Governors, take no part in the ultimate act of establishing rates. They are not among those to whom the Commission makes recommendations on rates the Postal Service proposes. Instead, the power to act on the Commission's recommendation is reserved to the nine Governors the President appoints with the advice and consent of the Senate pursuant to section 202(a) of the Act.
 
 
 11
 The Governors have several options with respect to the Commission's recommended decision. They may approve the Commission's recommendation, modify it, reject it or allow it to take effect under protest. Id. § 3625(a) (West 1980). If they reject the recommendation, the Postal Service "may resubmit its request to the Commission for reconsideration." Id. § 3625(d) (West 1980). If the Governors allow a recommended decision to take effect under protest, they may, nevertheless, ask the Commission to reconsider its decision or, alternately, seek judicial review. Id. § 3625(c) (West 1980). If they ask the Commission to reconsider, the Governors can modify the Commission's reconsidered recommendation only if they unanimously decide that it "is in accord with the record and the policies of" the rate-setting chapter of the Act, chapter thirty-six, and that the recommended rates are necessary to provide the Postal Service with total revenues sufficient to cover total costs. Id. § 3625(d). Air Courier has contended throughout this case that the Act requires the Postal Service to follow this procedure in setting international rates.
 
 
 12
 In 1970, the Postal Service introduced Express Mail Service for domestic deliveries. Later it extended Express Mail Service to almost 100 foreign countries. It now provides International Express Mail Service in a manner consistent with the Acts of the Universal Postal Union, a body created by international agreement among sovereign states.
 
 
 13
 Effective December 13, 1987, the Postal Service announced a new rate for Express Mail International Service for pieces weighing one-half pound or less. For most countries, the rate was $18.00 for any package weighing up to a half-pound. Without submitting the rate changes to the Commission, the Postal Service lowered the international express rate to $10.75 for half-pound packages effective July 1, 1989. The $10.75 rate was preceded by an even lower "special introductory rate" of $8.75 for mail weighing one-half pound or less to be effective from April 25, 1989 to July 1, 1989. 54 Fed.Reg. 17851, 17852 (1989). These rate changes are the subject of this suit. The $10.75 rate was increased in February of 1991, again without review by the Commission or the Governors. That change is not specifically challenged by Air Courier.
 
 III.
 
 14
 We have appellate jurisdiction, pursuant to 28 U.S.C.A. § 1291 (West Supp.1991), over the district court's final order dismissing plaintiffs' complaint. Two sections of the United States Code gave the district court subject-matter jurisdiction over this case. See 28 U.S.C.A. § 1339 (West 1976); 39 U.S.C.A. § 409(a) (West 1980).[2] Both sections grant district courts original jurisdiction of civil actions arising under acts of Congress relating to the postal service.
 
 
 15
 We exercise plenary review over the district court's order granting the Postal Service's Rule 12(b)(6) motion to dismiss count one of Air Courier's complaint as well as its order denying Air Courier's motion for summary judgment. Plenary review is doubly appropriate here because the single question this appeal presents is a legal issue of statutory construction or interpretation.[3] See Mack Boring & Parts v. Meeker Sharkey Moffitt, Actuarial Consultants of N.J., 930 F.2d 267, 270 (3d Cir.1991); Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 684 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1318 n. 7 (3d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).
 
 IV.
 
 16
 Both parties argue that the text of the Act and its legislative history support their position. The Postal Service, however, also argues that we should defer to its interpretation of the statute so long as that interpretation is reasonable. We will begin with an analysis of the language of the statute and its legislative history, then consider the effect of the Postal Service's interpretation.
 
 A.
 
 17
 Since "our starting point [in cases of statutory construction] must be the language employed by Congress," American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979)), we turn at once to the Act's text. In doing so, "we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.' " Id. (quoting Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962)). "We do not ... construe statutory phrases in isolation; we read statutes as a whole." United States v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); see Freytag v. Commissioner, --- U.S. ----, 111 S.Ct. 2631, 2636, 115 L.Ed.2d 764 (1991). If the Act's meaning is plain from its text, our task is complete, unless the result falls into the narrow category of cases where the plain meaning of the statute is "demonstrably at odds with the intentions of its drafters." Demarest v. Manspeaker, --- U.S. ----, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)).
 
 
 18
 Two chapters of title 39 of the United States Code are material to our case: chapter four entitled "General Authority" and chapter thirty-six entitled "Postal Rates, Classes, and Services." Chapter four's section 407(a), entitled "International postal arrangements," has major significance. It reads:
 
 
 19
 The Postal Service, with the consent of the President, may negotiate and conclude postal treaties or conventions, and may establish the rates of postage or other charges on mail matter conveyed between the United States and other countries. The decisions of the Postal Service construing or interpreting the provisions of any treaty or convention which has been or may be negotiated and concluded shall, if approved by the President, be conclusive upon all officers of the Government of the United States.
 
 
 20
 39 U.S.C.A. § 407(a) (West 1980) (emphasis added). Section 403(a), entitled "General Duties," is also material. See supra at 1215. We repeat it here:
 
 
 21
 The Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees. The Postal Service shall receive, transmit, and deliver throughout the United States, its territories and possessions, and, pursuant to arrangements entered into under sections 406 and 411 of this title, throughout the world, written and printed matter, parcels, and like materials and provide such other services incidental thereto as it finds appropriate to its functions and in the public interest. The Postal Service shall serve as nearly as practicable the entire population of the United States.
 
 
 22
 Id. § 403(a).
 
 
 23
 Various parts of chapter thirty-six are also material. Chapter thirty-six begins with four sections devoted to the organization of the Commission. See id. §§ 3601-04 (West 1980). The crux of the parties' dispute, however, lies in section 3621. It is entitled "Authority to fix rates and classes" and reads:
 
 
 24
 Except as otherwise provided, the Governors are authorized to establish reasonable and equitable classes of mail and reasonable and equitable rates of postage and fees for postal services in accordance with the provisions of this chapter.... Postal rates and fees shall provide sufficient revenues so that the total estimated income and appropriations to the Postal Service will equal as nearly as practicable total estimated costs of the Postal Service....
 
 
 25
 Id. § 3621 (West 1980) (emphasis added). Chapter thirty-six has no express exception for international rates. Air Courier would have us read section 3621's introductory clause, "Except as otherwise provided," to mean "except as otherwise provided" in chapter thirty-six. This reading would make section 407(a) granting the Postal Service the power to establish international rates, immaterial in the present dispute and give the Postal Service no more power with respect to international rates than it has over domestic rates, e.g., power to propose them to the Commission for recommendation to, and ultimate establishment by, the Governors.
 
 
 26
 The Postal Service, on the other hand, reads "[e]xcept as otherwise provided," the clause that introduces section 3621, to refer generally to any other conflicting provision of the Act, whether within or without chapter thirty-six. The Postal Service then goes on to argue that section 407(a) places the power to establish international mail rates in the Postal Service instead of the Governors, the ultimate authority with respect to domestic rates. Accordingly, the Postal Service says that section 407(a) is a provision in conflict with section 3621 and so provides an exception to the procedure chapter thirty-six requires with respect to domestic rates.
 
 
 27
 A full understanding of the parties' respective arguments about the meaning of section 3621's exception to the rate-making procedures of chapter thirty-six requires consideration of several other sections and subsections of that chapter, including sections 3622 and 3623. Section 3622 sets forth the process by which the Postal Service may ask the Commission to offer a recommended decision on proposed rates, id. § 3622, and section 3623 gives the Commission power to make recommendations to the Governors with respect to "Mail classification," id. § 3623 (West 1980). Section 3623 provides in material part:
 
 
 28
 The Commission shall make a recommended decision on establishing or changing the schedule in accordance with the policies of this title and the following factors:
 
 
 29
 (1) the establishment and maintenance of a fair and equitable classification system for all mail....
 
 
 30
 Id. § 3623(c)(1) (emphasis added). Air Courier gives particular emphasis to this of section 3623. From that section's use of the word "all," Air Courier argues that the Commission's power to recommend rates extends to international mail. Accordingly, Air Courier views section 407 as nothing more than a general enabling section that does not conflict with section 3622's requirement that the Commission pass on proposed rate changes for "all" classifications of mail before the Postal Service can unilaterally put them into effect. If Air Courier is correct, section 407 does not fall within section 3621's exception to the requirement that the Postal Service submit proposed rates to the Commission for recommendation to and ultimate establishment by the nine Governors.
 
 
 31
 Section 3684 is also material to the parties' arguments. It is entitled "Limitations" and reads:
 
 
 32
 Except as provided in section 3627 of this title, no provision of this chapter shall be construed to give authority to the Governors to make any change in any provision of section 3682 or 3683 or chapter 30, 32, or 34 of this title.
 
 
 33
 Id. § 3684 (West Supp.1991). Since section 3684 restricts the authority of the Governors, the Postal Service maintains that section 3684 is the subject of section 3621's general admonition to the Governors to exercise their powers "in accordance with the provisions of this chapter." Therefore, says the Postal Service, the clause "Except as otherwise provided" that introduces section 3621 is redundant unless it is construed to refer to exceptions in the Act beyond those contained in chapter thirty-six. Air Courier, on the other hand, contends that section 3621's general admonition to act "in accordance with the provisions of this chapter" tells the Governors how to proceed, while section 3684 restricts the Governors' substantive power and authority. Accordingly, Air Courier says that section 3621's limiting introductory clause, "Except as otherwise provided," has independent meaning even if restricted to exceptions set out in chapter thirty-six because this introductory clause, rather than section 3621's procedural directive to the Governors to act in accord with chapter thirty-six, refers to section 3684's substantive limits on the Governors' power.
 
 
 34
 After considering all the parties' arguments about the interaction of these various sections in chapter thirty-six, we are inevitably drawn back to the initial sentence of section 3621. As stated above, it reads:
 
 
 35
 Except as otherwise provided, the Governors are authorized to establish reasonable and equitable classes of mail and reasonable and equitable rates of postage and fees for postal services in accordance with the provisions of this chapter.
 
 
 36
 Id. § 3621 (emphasis added). The clause "Except as otherwise provided" is without qualification. Read naturally, it includes any other provision in the Act. Air Courier's contention that any exceptions to the Commission's power contained in section 407(a) are not affected by the clause "Except as otherwise provided" because section 407(a) is not in chapter thirty-six requires us to read the introductory language of section 3621 as "Except as otherwise provided [in this chapter]," thus adding the bracketed phrase to the statute. Air Courier's substance and procedure argument does not negate section 3621's demonstration that Congress knew how to limit the application of portions of the act to a particular chapter. The first sentence of section 3621 ends by saying that the Governors must exercise their authority "in accordance with the provisions of this chapter." Id. Yet the limitation on the Governors' power at the beginning of the same sentence is not so limited. The plain language of section 3621 is in accord with the construction of the Postal Service not that of Air Courier. The question whether section 3621's introductory clause, "Except as otherwise provided," or the phrase "in accordance with" in section 3621 refers to section 3684 misses the point. Even if the introductory clause does refer to section 3684, the absence of limitation on its generality, contrasted with the same sentence's later plain limitation of the restriction on the Governors' power to the procedures of chapter thirty-six, also implies the introductory clause's inclusion of section 407(a) in its frame of reference.
 
 
 37
 Air Courier's argument that section 3622(a) requires the Postal Service to submit any rate change to the Commission likewise fails. That section reads, in part:
 
 
 38
 From time to time the Postal Service shall request the Postal Rate Commission to submit a recommended decision on changes in a rate or rates of postage or in a fee or fees for postal services if the Postal Service determines that such changes would be in the public interest and in accordance with the policies of this title.
 
 
 39
 Id. § 3622(a). The quoted language of section 3622(a) is also modified by section 3621's introductory clause, "Except as otherwise provided." Section 3622 outlines the powers of the Commission. All the Commission's decisions are subject to review by the Governors. See id. § 3624(c) & (d); id. § 3625. Thus, any restriction on the action of the Governors under section 3621 necessarily applies to the Commission. Air Courier's argument based on section 3623(c)(1), see supra at 1218-1219, fails for the same reason.
 
 
 40
 Still, Air Courier's arguments are not wholly answered; nor is the Postal Service's position wholly supported by a textual exegesis limited to chapter thirty-six. We must yet determine whether section 407(a) conflicts with chapter thirty-six and so fits within section 3621's introductory general exception. We start again with the text of section 407(a). As noted above, it gives the Postal Service the authority, with the consent of the President, to "establish the rates of postage or other charges on mail matter conveyed between the United States and other countries." 39 U.S.C.A. § 407(a). The Postal Service says this plainly "excepts" international rates from the ultimate power section 3621 gives the Governors. Again, we think the Postal Service has the better of the argument. If the power over international rates that section 407(a) gives the Postal Service is subject to the requirements of chapter thirty-six, we would expect to find an analogous section giving the Postal Service power to establish, not just request, domestic postage rates. We find none and instead see that chapter thirty-six permits the Postal Service to do no more than request changes in domestic rates.[4] Section 407 plainly gives the Postal Service the ability to establish rates of postage for international mail.
 
 
 41
 The words Congress chose in writing section 407 are telling: "The Postal Service ... may establish the rates of postage or other charges on mail matter conveyed between the United States and other countries." Id. (emphasis added). If international postage rates were subject to chapter thirty-six's approval process, the Postal Service could not "establish" them. See Webster's New Dictionary and Thesaurus 197 (Concise ed. 1990) (defining "establish" as "to set up ... permanently ..."). Instead, they would be "requested" by the Postal Service, "recommended" by the Commission, 39 U.S.C.A. § 3622(a), and "established" by the Governors, id. § 3621. Indeed, section 3621, in describing the Governor's power, uses "establish," precisely the same verb as section 407(a) uses to give the Postal Service power over international rates. If section 3621 covered international, as well as domestic, postage rates, courts would face no mean feat in reconciling the power of the Postal Service to "establish" international postage rates with the power of the Governors to "establish" rates for the same service. Reading the introductory exception to section 3621 to refer to any exception found in the Act, including section 407(a), resolves this potential conflict between the Governors' and the Postal Service's discrete powers to "establish" rates for different kinds of mail.
 
 
 42
 We have not rejected Air Courier's position without also considering its argument that this case is controlled by several cases striking down the Postal Service's attempts to assert some power over domestic rates. Air Courier relies particularly on our decision in United Parcel Serv., Inc. v. United States Postal Serv., 604 F.2d 1370, 1374 (3d Cir.1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980). There, we affirmed the district court's holding that the Postal Service could not offer experimental postage rates for domestic mail unless they had been approved in accordance with the provisions of chapter thirty-six. Id. at 1381-82. United Parcel Service concerned a Postal Service experiment under which certain shippers were charged a flat rate for each mail piece, regardless of its weight. To qualify for the flat rate, a shipper had to agree to ship a minimum amount of mail on a daily and weekly basis. By experimentally offering customers this option, the Postal Service sought data on whether such a flat rate structure was more cost-effective than a rate based on the weight of individual items. This experiment was undertaken without approval of the Commission or the Governors. Id. at 1372.
 
 
 43
 The Postal Service contended that its authority under section 403(a) to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees" allowed it to undertake the experiment without proposing the experimental domestic rate to the Commission in accord with the procedures set forth in chapter thirty-six. We rejected the Postal Service's argument, stating:
 
 
 44
 [T]he Act is completely unequivocal in requiring all changes in any rates and any mail classification to be processed through and by the Commission.
 
 
 45
 Id. at 1375 (emphasis original).
 
 
 46
 Air Courier contends that United Parcel Service establishes the proposition that the specifics of section 3622 govern the generalities of section 407(a). This argument's appeal is superficial. The differences between section 403(a) and section 407(a) undermine the logic of Air Courier's proposed extension of United Parcel Service's rationale. In reasoning by analogy from the facts of one precedent to another, courts must be satisfied the analogy is apt. Here, the differences in the statutory language governing domestic and international postage rates set out above defeat Air Courier's analogy to United Parcel Service's rationale. Section 403(a) sets forth the Postal Service's general mission to provide good service at fair rates. Section 407(a) is more specific. It gives the Postal Service power to "establish" rates for international mail. The mere presence of both section 407(a) and section 403(a) in the chapter governing the Postal Service's general authority is not enough to support Air Courier's analogy. In giving the Postal Service the authority to "establish" international mail rates, section 407(a) is just as specific about international rates as chapter thirty-six is about domestic rates. Section 407(a) tells us how international postage rates are to be set and who sets them. Chapter thirty-six tells us how domestic postage rates are to be set and who sets them. The statute says the Postal Service "establishes" international rates just as plainly as it says the Governors "establish" domestic rates.
 
 
 47
 In United Parcel Service, we did not discuss or even mention section 3621's introductory clause, "Except as otherwise provided." The narrow issue in United Parcel Service was whether, under sections 3622(b) and 3623, the Postal Service's experiment was "a 'change' in any 'rate' or 'mail classification.' " Id. at 1375.[5] United Parcel Service provides no analogy for the case before us.
 
 
 48
 The Act, read as a whole, see Morton, 467 U.S. at 828, 104 S.Ct. at 2773, plainly authorizes the Postal Service to "establish" international postage rates. 39 U.S.C.A. § 407(a). On the other hand, it provides that the Postal Service can only request changes in domestic rates. Its requests are subject to the Commission's recommendation and the Governors's power to "establish" domestic rates. Id. §§ 3621, 3622(a).
 
 
 49
 Given the Act's language, its legislative history does not demonstrate that the Postal Service's reading of section 407(a) and section 3621 is "demonstrably at odds with the intentions of its drafters." Demarest, 111 S.Ct. at 604 (quoting Griffin, 458 U.S. at 571, 102 S.Ct. at 3250). Air Courier's argument that the Act's legislative history supports a contrary result revolves partly around a clause in the House Bill that was left out of the Senate version ultimately enacted into law. The clause in the House Bill read:
 
 
 50
 The provisions of this chapter[, what is now chapter thirty-six,] do not apply to changes in the fees or rates of exchange for international money orders and similar instruments or to changes in international postal rates adopted pursuant to section 405 [section 407 of the final version of the Act] of this title.
 
 
 51
 H.R. 17070, 91st Cong., 2d Sess. § 1252(c) (1970), reprinted in 116 Cong.Rec. 20214, 20223 (1970), reprinted in App. at 73. Because this exclusion of international rates from the powers and procedures of chapter thirty-six was not expressly put into the Senate's final version of the Act, Air Courier contends that Congress intended chapter thirty-six's procedures to apply to all postage rates, international or domestic. In the face of the power section 407(a) expressly gives the Postal Service to "establish" international rates, this piece of legislative history is not controlling.
 
 
 52
 Moreover, the House and Senate versions of the bill both contained sections similar to section 407(a) of the Act. Both placed the power to establish international rates in the Postal Service. See H.R. 17070, 91st Cong., 2d Sess. § 1252(c) (1970), reprinted in 116 Cong.Rec. 20223 (1970), reprinted in App. at 73; S.R. 3613, 91st Cong., 2d Sess. § 504 (1970), reprinted in App. at 62. Accordingly, the conferees who approved the final version could well have concluded section 1252(c) of the House version was unnecessary. When the specific exception present in section 1252(c) of the House bill was dropped in the final Senate version of the bill, the clause introducing section 3621, "[e]xcept as otherwise provided," was retained. Again, read naturally, this broad exception and section 1252(c) of the House bill accomplish the same purpose.
 
 
 53
 History also lends support to our conclusion that the failure of Congress to retain section 1252(c) of the House bill in the final form of the legislation is not controlling. Before the Act was passed, international rates had been set by the Postmaster General's administrative fiat while domestic rates were set by Congress. The legislative history does not indicate that Congress intended to change or restrict the power the agency in charge of delivering the mails had always had over international rates.[6] Instead, that history seems generally more consistent with an intent by Congress to substitute an independent regulatory check on the operating agency's monopoly power over domestic rates for the prior political check of direct Congressional approval.
 
 
 54
 At best, the failure to include House bill section 1252(c) in the final version of the Act is ambiguous. We decline to use ambiguous legislative history to contradict a clear statute's text. Accordingly, we will not speculate as to whether House bill section 1252(c) was deleted because Congress wanted the Commission to set international rates or instead because Congress simply thought it unnecessary in the face of the Act's introductory proviso to section 3621.
 
 
 55
 In short, the legislative history of the Act does not provide any convincing basis for concluding that the plain meaning of the statute's language is contrary to Congress's intention.[7]
 
 B.
 
 56
 Our holding that the text of the Act requires affirmance of the district court's judgment in favor of the Postal Service is strengthened by the long-standing interpretation both the Postal Service and the Commission have given the statute. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984) (Marshall and Rehnquist, JJ., not participating in the consideration or decision, and O'Connor, J., not participating in the decision).
 
 In Chevron, the Supreme Court stated:
 
 57
 We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer ... "whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting [the] matters [at issue]."
 
 
 58
 Id. at 844, 104 S.Ct. at 2782 (quoting United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). The Supreme Court has also held that an agency's view of its own statutory jurisdiction may be entitled to deference under Chevron. See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 844, 106 S.Ct. 3245, 3253, 92 L.Ed.2d 675 (1986) (citing Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2782-83; Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969)). The deference we are instructed to give to an agency's view of the scope of the statute that governs its activities is heightened when the interpretation is made contemporaneously with the statute's implementation. See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).
 
 
 59
 The Postal Service's construction of section 407(a) to grant itself the power to establish international postage rates is analogous to the Commodity Futures Trading Commission's assertion of jurisdiction over state-law counterclaims made in the course of reparations proceedings under the Commodity Exchange Act. Cf. Schor, 478 U.S. at 841-47, 106 S.Ct. at 3251-55. In Schor, the regulatory body was construing the provisions of the act that controlled its administrative powers. Compare id. at 836, 106 S.Ct. at 3249 with 39 U.S.C.A. § 201; compare Schor, 478 U.S. at 841-44, 106 S.Ct. at 3251-53 with 39 U.S.C.A. §§ 407(a) & 3621.
 
 
 60
 Of course, we recognize that judicial deference to an agency's construction of a statute in conflict with the statute's plain meaning would be inappropriate. See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). The agency's interpretation must be reasonable. See Puerto Rico Maritime Shipping Auth. v. Valley Freight Sys., Inc., 856 F.2d 546, 552 (3d Cir.1988). Here, the Postal Service's construction is certainly reasonable. Compare Schor, 478 U.S. at 841-45, 106 S.Ct. at 3251-54 supra at 1217-22.[8] As in Schor, the Postal Service's interpretation was made contemporaneously with the implementation of the Act. Compare Schor, 478 U.S. at 836-837, 106 S.Ct. at 3249 with 36 Fed.Reg. 8331 (1971) ("Postage rates and fees on international mail are established pursuant to 39 U.S.C. 505, as enacted by the first section of Public Law 86-682 (cf. 39 U.S.C. 407, as enacted by section 2 of the Postal Reorganization Act), and not pursuant to chapter 36 of title 39, U.S.C.").[9] In Schor, the Supreme Court described the Commodity Futures Trading Commission's position as follows:
 
 
 61
 The CFTC's long-held position that it has the power to take jurisdiction over counterclaims such as Conti's is eminently reasonable and well within the scope of its delegated authority. Accordingly, as the CFTC's contemporaneous interpretation of the statute it is entrusted to administer, considerable weight must be accorded the CFTC's position.
 
 
 62
 Schor, 478 U.S. at 844, 106 S.Ct. at 3253.
 
 
 63
 The analogy is plain and Air Courier's arguments that Chevron does not apply to the Postal Service's interpretation of section 407(a) because "the Supreme Court and this Court have both held that the Postal Service's interpretation of the ratemaking provisions of the Act is not entitled to judicial deference" is unpersuasive. Brief for Appellant at 44 (citing National Ass'n of Greeting Card Publishers v. United States Postal Serv., 462 U.S. 810, 103 S.Ct. 2717, 77 L.Ed.2d 195 (1983) [hereinafter Greeting Card II ]; United Parcel Serv., 604 F.2d at 1381). In Greeting Card II, the Supreme Court deferred to the Commission's interpretation of section 3622(b). See Greeting Card II, 462 U.S. at 825-26, 830, 833, 103 S.Ct. at 2727-28, 2730, 2731. The Commission's interpretation was favored over the "Postal Service's" not because of any blanket prohibition against deferring to the "Postal Service," but because the Commission's interpretation was a reasonable construction of the Act. Id. at 833, 103 S.Ct. at 2731. Here, the Commission agrees with the Postal Service. See Postal Rate Comm'n Op. & Recommended Decision, No. R 80-1 at 554 (1981), reprinted in App. at 35; id. Appendix F at 6-7, reprinted in App. at 84-85; Postal Rate Comm'n Op. & Recommended Decision, No. R76-1 Appendix F at 17 (1976), reprinted in App. at 81.
 
 
 64
 Once again, Air Courier's reliance on United Parcel Service is misplaced. There we refused to defer to the Postal Service because its interpretation was inconsistent with the Act. See United Parcel Service, 604 F.2d at 1380. Here, its interpretation is wholly consonant with the Act's text.
 
 
 65
 Air Courier's contention that a court needs no help from an agency in deciding a purely legal question of statutory construction conflicts with the rationale of Chevron and its argument that deference is inappropriate because the Postal Service is arguing in its own bureaucratic self-interest runs counter to Chevron.[10] Air Courier's argument that the Postal Service's bureaucratic bias lessens the need for deference is counter-balanced by the express acquiescence of the Commission in the Postal Service's view. Moreover, its attempt to minimize the Commission's agreement with the Postal Service concerning the interpretation of their respective powers under the Act because the Commission's pronouncements on the subject are evidenced only by loose, general statements analogous to obiter dicta instead of careful consideration after adversary briefing in the context of a particular dispute is not persuasive. Chevron is controlling.[11]
 
 V.
 
 66
 For all of these reasons, we will affirm the judgment of the district court.
 
 
 67
 BECKER, Circuit Judge, concurring.
 
 
 68
 Judge Hutchinson has convincingly demonstrated that the language and legislative history of the postal rate statute support the conclusion that the Postal Service has the power to set international postal rates without input from the Postal Rate Commission. I therefore join Parts I, II, III, IV.A, and V of the majority opinion without qualification. In my view, the traditional methods of statutory interpretation suffice to point to the proper result, and hence I am hesitant to address the question of deference, as the majority does in Part IV.B. But because the majority has done so, I will address that question, joining in the conclusion reached in Part IV.B, subject to the following reservations.
 
 
 69
 Part IV.B invokes deference to the Postal Service's interpretation of its own jurisdiction, an interpretation that has remained consistent since the enactment of the postal rate amendments over twenty years ago. The majority also notes the concurring view of the Postal Rate Commission, the only agency that might possibly also lay claim to the international postal ratesetting "turf." Although I agree that deference may be appropriate (although probably unnecessary) in this case, I do not read the case law of the Supreme Court or this circuit to hold that an agency always deserves deference on a jurisdictional question if its position is reasonable and consistent. In my view, the rule is more limited: agencies may be entitled to deference on jurisdictional questions, especially where the statutory authorization is quite broad, implying a congressional belief that the agency possesses superior expertise in determining how to effectuate the statutory purposes.
 
 
 70
 In Commodity Futures Trading Commission v. Schor, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), the Supreme Court accorded deference to the CFTC's consistent, longstanding, and reasonable interpretation of its own jurisdiction to hear state-law counterclaims. Justice O'Connor's discussion was carefully crafted, however, to avoid making a general statement about deference to agencies' interpretations of their own jurisdiction. The relevant paragraph of Schor reads:[T]he Court of Appeals was incorrect to state on the facts of this case that the CFTC's expertise was not deserving of deference because of the 'statutory interpretation-jurisdictional' nature of the question at issue.... An agency's expertise is superior to that of a court when a dispute centers on whether a particular regulation is "reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes" of the Act the agency is charged with enforcing; the agency's position, in such circumstances, is therefore due substantial deference.
 
 
 71
 478 U.S. at 845, 106 S.Ct. at 3253 (quoting the authorizing statute, 7 U.S.C. § 12a(5)) (emphasis added).
 
 
 72
 As I read Schor, the Court only decided that, in light of the extremely broad authorizing language of that statute, the CFTC had superior expertise in interpreting the statute, even though the particular dispute focused on a jurisdictional issue. No doubt, Schor's logic could be extended more broadly, see Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 380-82, 108 S.Ct. 2428, 2443-45, 101 L.Ed.2d 322 (1988) (Scalia concurring in the judgment), but Schor can also be read narrowly, see id. at 386-88, 108 S.Ct. at 2446-48 (Brennan, joined by Marshall and Blackmun, dissenting) (no deference appropriate in interpreting a statute specifically designed to confine agency jurisdiction). The majority of the Court has not taken a clear stance since Schor.
 
 
 73
 Therefore, although Puerto Rico Maritime Shipping Authority v. Valley Freight Systems, 856 F.2d 546, 552 (3d Cir.1988), cited Schor for the proposition that the Chevron "rule of deference is fully applicable to an agency's interpretation of its own jurisdiction," in my view, that statement should not be read literally to suggest that agencies always possess superior expertise in determining their jurisdiction and hence always deserve deference on that issue, because Schor did not so hold. Instead, Puerto Rico Maritime Shipping Authority should be read, like Schor, to hold only that deference may be accorded to agencies' jurisdictional positions in appropriate cases.
 
 
 74
 I remain skeptical that full-fledged Chevron deference should apply in all such cases,* but I am content to leave that issue for another day. I conclude that in this case it is appropriate to rely secondarily on the agencies' views. It is true that we do not interpret a broadly-worded authorization in this case, as the Supreme Court did in Schor. Moreover, as Air Courier has argued, as a general matter the Postal Service is no better at pure statutory interpretation than the judiciary, and the Postal Service is certainly more biased than we. But the Postal Service may be better positioned to say what would be a sensible construction of these statutory provisions, for the interpretation has significant international relations ramifications that we are ill-equipped to evaluate. In sum, although the Postal Service is no better than we at saying which construction is most consistent with the statutory language and legislative history, it may be better able to judge which construction makes the most policy sense and should therefore be imputed to Congress.
 
 
 75
 Therefore, to the very limited extent that we may appropriately look beyond the statutory text and legislative history in this case, I agree with the majority that we may rely on the Postal Service's interpretation. That is especially so here, where it is undisputed that Congress submitted international ratemaking decisions to an administrative agency process, and both potentially competing administrative bodies agree that, in light of the complexities of international postal obligations, the Postal Service is better suited to handle international ratemaking without Commission input. Even though the Postal Service is obviously self-interested in claiming sole jurisdiction over international ratemaking, the Commission has little self-interest in ruling that it lacks any jurisdiction. That interagency agreement makes me far more comfortable with according deference in this case. I stress, however, that both of my reasons for deferring in this case are not reasons that are generally applicable to jurisdictional disputes.
 
 
 76
 For the foregoing reasons (and with the foregoing reservations), I join in the majority opinion and in the judgment.
 
 
 
 *
 Hon. John P. Fullam, Senior District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 A seventh individual international carrier was later added as a plaintiff by stipulation. (Appendix (App.) at 4)
 
 
 [2]
 There is an exception to section 409(a)'s general grant of jurisdiction to the district courts, but it does not apply to this case. It states: "Except as provided in section 3628 of this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C.A. § 409(a). Section 3628 gives the courts of appeals the power to review decisions of the Governors that "approve, allow under protest, or modify [a] recommended decision of the ... Commission." 39 U.S.C.A. § 3628 (West Supp.1991). Here there has been no action by the Governors and the sole issue is whether the Postal Service must submit its proposed international rate to the Commission so that the Commission can make a recommendation to the Governors
 
 
 [3]
 The issue of what a statute means, unlike the issue of what a contract means, is always a legal issue subject to plenary review whether it is denominated one of construction or interpretation. Consequently, the use of one or the other in this opinion is without distinction in meaning. Cf. Washington Hosp. v. White, 889 F.2d 1294 (3d Cir.1989) (noting distinction between the interpretation of an agreement and the construction of an agreement)
 
 
 [4]
 Air Courier's contention that section 407(a) does have an analog in section 403(a), which requires the Postal Service to provide service at "fair and reasonable rates" proves too much. Section 403(a) requires that the Postal Service provide service at reasonable rates throughout the United States and, pursuant to international agreements, the world. Section 403(a) does not talk about establishing rates; it talks about providing services. Section 407, on the other hand, does talk about establishing rates. Moreover, since section 403(a) talks about providing service throughout the United States and the world, treating it as an analog to section 407(a), as Air Courier says, would render section 407(a) partially redundant. See United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955) (statute should be read to give meaning to each provision)
 
 
 [5]
 Air Courier also relies on National Ass'n of Greeting Card Publishers v. United States Postal Serv., 569 F.2d 570 (D.C.Cir.1976) (per curiam) [hereinafter Greeting Card I ], consol. case vacated on other grounds, United States Postal Serv. v. Associated Third Class Mail Users, 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977). In Greeting Card I, the Postal Service argued that its section 404(a)(6) authority to provide special services exempted it from submitting rates for those special services to the Commission. The District of Columbia Circuit held that the Commission had jurisdiction over fees for special services. Id. at 598. Greeting Card I, is distinguishable because section 404(a)(6) gives the Postal Service power only to "provide" or "establish" special services, not to set rates for special services once it decides to offer them. See 39 U.S.C.A. § 404(a)(6) (West 1980) (The Postal Service shall have the power "to provide, establish, change or abolish special nonpostal or similar services."). Section 407(a) expressly authorizes the Postal Service to establish rates for international service
 
 
 [6]
 Congressman Dulski, in his statement on behalf of the conference committee that considered the Postal Reorganization Act, noted:
 The Senate also accepted House provisions to continue many existing laws including ... [i]nternational postal and money order arrangements.
 
 
 [116]
 Cong.Rec. 27595, 27596 (Aug. 6, 1970)
 
 
 [7]
 We have, of course, reviewed other portions of the legislative history of the Act, not mentioned above, that Air Courier and the Postal Service cite and concluded they too lend no real support to either party
 
 
 [8]
 The Commodity Futures Trading Commission's promulgation of a regulation to assert its jurisdiction over state-law counterclaims is an immaterial distinction. In Schor, the Court stated "Congress' assumption that the [agency] would have the authority to adjudicate counterclaims is evident on the face of the statute." Schor, 478 U.S. at 841-42, 106 S.Ct. at 3251. The regulation at issue in Schor, like the Postal Service's construction of section 407(a), merely restated a statutory authorization. Thus, both the Commission in Schor and the Postal Service are merely construing the terms of their governing statute and not engaging in law-making functions Congress has entrusted to an administrative agency
 
 
 [9]
 The reference in the Postal Service's notice to both section 505 and section 407 was necessary because the Act became effective in stages and section 407 became effective after chapter thirty-six. Thus, sections 3621 through 3641 and sections 3681 through 3685 became effective on January 20, 1971. 36 Fed.Reg. 785 (1971). Section 407(a) became effective on July 1, 1971. Id. Accordingly, the construction of the statute at issue here was originally made by the Postal Service's predecessor, the Post Office Department, on May 16, 1971, before the Postal Service came into existence. 36 Fed.Reg. 8331. Prior to section 407's effective date, section 505 was the section governing international postage rates. See 39 U.S.C.A.App. § 505(a)
 
 
 [10]
 Our decision in Department of the Navy, Military Sea Lift Command v. FLRA, 836 F.2d 1409, 1415 (3d Cir.1988), is not to the contrary. There, two agencies had construed two different statutes in ways that brought the statutes themselves into conflict and we had to resolve the direct conflict between the two statutes thus created. Here, we have one statute consistently construed by both the Postal Service and the Commission
 
 
 [11]
 In view of our construction of the Act, we need not and do not consider the Postal Service's argument that review of international rates by the Commission under chapter thirty-six would conflict with international agreements that put the power to set international rates in the Universal Postal Union
 
 
 *
 For another intermediate view, see Cass R. Sunstein, Law and Administration After Chevron, 90 Colum.L.Rev. 2071, 2100 (1990):
 Probably the best reconciliation of the competing considerations of expertise, accountability, and partiality is to say that no deference will be accorded to the agency when the issue is whether the agency's authority extends to a broad area of regulation, or to a large category of cases, except to the extent that the answer to that question calls for determinations of fact and policy. On this approach, there is no magic in the word "jurisdiction." Instead, the question is whether the agency is seeking to extend its legal power to an entire category of cases, rather than disposing of certain cases in a certain way or acting in one or a few cases.
 (footnote omitted).
 See also ACLU v. FCC, 823 F.2d 1554, 1567 n. 32 (D.C.Cir.1987) (per curiam):
 
 
 a
 pivotal distinction exists between statutory provisions that are jurisdictional in nature--that is, provisions going to the agency's power to regulate an activity or substance ...--and provisions that are managerial--that is, provisions pertaining to the mechanics or inner workings of the regulatory process.... Where the issue is one of whether a delegation of authority by Congress has indeed taken place (and the boundaries of any such delegation), rather than whether an agency has properly implemented authority indisputably delegated to it, Congress can reasonably be expected both to have and to express a clear intent. The reason is that it seems highly unlikely that a responsible Congress would implicitly delegate to an agency the power to define the scope of its own power